UNITED STATES of America,

v.

Walter Lee BROWN, Defendant.

Cr. A. No. 92–79–MAC(DF).

United States District Court,
M.D. Georgia,
Macon Division.

May 27, 1993.

Dixie A. Morrow, Asst. U.S. Atty., Macon, GA, for plaintiff.

Sandra J. Popson, Macon, GA, for defendant.

FITZPATRICK, District Judge.

Pending before the court is Defendant's motion to suppress as amended. The court heard evidence and argument from counsel regarding this motion on May 25, 1993. After consideration of the evidence and the applicable law, this court enters this Order.

### BACKGROUND FACTS

The testimony and evidence at the hearing showed the following facts:

On August 6, 1990, at approximately 12:45 p.m., a black male entered the First South Bank in Montezuma, Georgia, armed with a large, nickel-plated handgun. He was wearing a ball cap and dark glasses. He ordered tellers to assist him in emptying the cash drawers while pointing the pistol at them. During the course of the robbery, one of the tellers was shot in the chest and killed.

Bank surveillance cameras were activated during the robbery. From this film, special agents with the Georgia Bureau of Investigation ("GBI") and the Federal Bureau of Investigation ("FBI") made at least one still

photograph. They then circulated this still photograph to local area law enforcement agencies and the local newspapers. The picture appeared on the front page of the next day's newspaper in Americus, Georgia, as well as in other cities and towns in central and south Georgia.

During the course of the investigation, officers received approximately eight phone calls identifying four possible suspects from the picture printed in the newspaper. Three of the phone calls identified the man in the picture as the Defendant, Walter Lee Brown. Two of those callers stated that they worked with the Defendant. Each of these potential suspects were further investigated. All but one of them had alibis for the time of the bank robbery—that one was the defendant in this case.

The robbery occurred around 12:45 p.m. It is about a twenty-five minute drive from Montezuma to Americus, Georgia. Defendant allegedly had made one stop in Americus to make a payment on a loan. The credit institution was about five to ten minutes from his place of employment at Davidson Rubber Company. In any event, the investigation showed that he did not arrive at work until 3:20 that afternoon. Therefore, the investigators determined Mr. Brown did not have an alibi for the time of the robbery.

At some point during the day of August 7, 1990, Officer Moran showed the picture in the newspaper to Lieutenant Brown of the Americus Police Department. Lieutenant Brown testified that he immediately identified the subject in the picture as Defendant Walter Lee Brown. Lieutenant Brown had known the Defendant for 20 to 25 years—since their high school days together in Americus. He had also arrested Defendant Brown for armed robbery several years earlier.

Law enforcement officers learned that the Defendant had made several cash payments, either the day of the robbery or the next day, toward outstanding loans with different credit institutions in Americus. These cash payments totaled about $1800.

Later that night, all of the agencies involved in investigating this crime met at the district attorney's office for the state judicial circuit that encompasses Americus. At that meeting, Lieutenant Brown again identified this Defendant from the original photograph taken from the bank surveillance camera.

A joint decision was made by representatives from all of the agencies involved in the case to prepare search warrant applications for Mr. Brown's house and cars seeking further evidence of the crimes with which he is now charged. As Special Agent Jackson left with the applications to have them reviewed and ruled on by the county magistrate judge, officers watching Mr. Brown's home notified the officers at the meeting that Mr. Brown was leaving his house in the yellow Thunderbird—one of the cars that was to be searched if the magistrate executed the warrants. The agencies' representatives then made another joint decision to stop Mr. Brown's car before he was able to go much further from his house. The possibility of losing the prime suspect in an armed robbery and homicide loomed before the investigating officers if they did not at least attempt to stop the car.

Between four and five police cars were involved in the stop of Defendant's car just down the street from his residence. At least one of those cars was in front of the Defendant's car and there may have been one or two cars to the side of the vehicle. There were two cars parked directly behind Defendant's car.

As officers approached the Defendant, he got out of his car. He recognized and spoke to Lieutenant Brown as the officer neared him. The officers asked Mr. Brown to wait in one of the marked patrol cars while a search warrant was brought to the scene for the Thunderbird. His car keys were removed from the car. One officer, Special Agent Willis with the GBI, testified that Mr. Brown was not free to go, had he wanted to leave, after his car was stopped by the task force officers.

The search of the cars and Mr. Brown's residence continued. Shortly after the arrival of the warrants and 30 to 40 minutes after Mr. Brown had been stopped in his car, an officer discovered a large sum of money in a purse that belonged to Mrs. Brown and was

inside the residence. The funds were seized, inventoried and catalogued. The serial numbers on the twenty dollar bills found in the purse were compared to the list of bait money taken during the robbery. Nine or ten bills had serial numbers that matched the list of serial numbers of the bait money.

Once officers identified the first matching bill, that information was relayed by radio to the officers searching the yellow Thunderbird. Upon his receipt of the information relating to the discovery of the bait bill, Agent Willis formally informed Mr. Brown that he was under arrest for armed robbery. Lieutenant Brown placed handcuffs on the Defendant and began a search of his pockets and clothing. Mr. Brown's wallet was removed and officers discovered over $2200 inside. Again, nine or ten of the twenties found inside the wallet had serial numbers that matched the list of bait money stolen from the bank.

The officers completed the first search of the house and cars about 4:00 a.m. the morning of August 8th. They posted security around the house to prevent any evidence being removed or contraband being left at the house in the interim. At 10:00 a.m. on the 9th, officers obtained new search warrants for the cars and the house. While searching around the wooden fence that encloses the backyard to the property, an officer noted a piece of cloth sticking out of the woodpile next to the fence. The officers took photographs of the woodpile as discovered and additional pictures of the woodpile as it was dismantled to examine what this piece of cloth was. They found a shirt that was wrapped around items inside it. Inside the bundle they discovered a nickel-plated .357 magnum handgun and $5850 in currency, most of it still in First South Bank money wrappers.

### CONCLUSIONS OF LAW

Defendant poses three challenges in his motion to suppress evidence. First, he contends that the affidavits initially provided to the magistrate contained insufficient information to support a finding of probable cause. Second, he argues that he was arrested the moment that he was stopped and that

his arrest was without probable cause. His third contention is that the search warrant that described his house did not authorize a general search of his property so that the search of the woodpile exceeded the scope and permission provided by the search warrant.

### I. Sufficiency of the Affidavits in Support of the Application for the Search Warrant

■ Defendant's first argument is meritless. The warrant application and affidavit contains much of the information that is detailed above. Specifically, the affiant relates the three anonymous tips received by law enforcement. He details that two of the callers claimed to work with the Defendant. The affidavit includes the identification made by Lieutenant Brown from the surveillance photograph and the length of time Lieutenant Brown has known the Defendant. In addition, the Defendant's criminal history for armed robbery was provided to the magistrate. He was also given the information developed regarding the cash payments made on debts on the day of and the day following the robbery.

The court finds that this information is more than sufficient to support a finding of probable cause. The officers did an admirable job, in the heat of a serious criminal investigation, of providing as much detail and information as they had at the time the affidavits were prepared. As the Supreme Court has stated,

[A]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and court in a common sense and realistic fashion. They are commonly drafted ... in the midst and haste of a criminal investigation. **Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.** *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) (emphasis added). Therefore, while specificity is not required, these officers provided the magistrate as much information as they possessed at the time they made the warrant application. The affidavit contained suffi-

cient information to support a finding of probable cause and the magistrate acted properly in issuing the warrants applied for. It detailed the tips from the callers, the positive identification of the Defendant by Lieutenant Brown, the activity of the Defendant following the robbery, the Defendant's past criminal history, and the payment of a large sum of money on various outstanding loans. The magistrate could discern from this information that more than a "fair probability that contraband or evidence of a crime will be found in a particular place" existed. *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir.1991).

## II. The Arrest of Defendant and the Search Incident to that Arrest

■■■ Defendant next wishes this court to find that he was technically arrested the moment his car was stopped and that that arrest was without probable cause. Probable cause is defined as "the facts and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information ... [that are] sufficient in themselves to warrant a man of reasonable caution in the belief that" a crime has been committed and that the person seized committed that crime. It is not the knowledge of any one particular officer that is at issue, rather the collective knowledge of all the officers investigating the case or involved in the arrest. *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir.) *cert. denied sub nom. Fazio v. United States*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). The officer must have more than a suspicion, but need not have sufficient evidence for a conviction at the time the arrest was made. *United States v. Preston*, 608 F.2d 626, 632 (5th Cir.1979) *cert. denied* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980).

■■■ In this case, the Defendant was clearly not free to leave from the moment his car was stopped by the officers. Once a suspect is seriously deprived of his freedom of movement, he has been arrested. *United States v. Henry*, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Agent Willis testified to that fact upon questions from the bench. The Defendant's car was hemmed in by police vehicles. (Lieutenant Brown testified he

might have been able to squeeze through the gaps between the cars had he wanted to, but this really does not matter.) The keys had been removed from the vehicle and the Defendant was sitting in the back of a marked patrol car. It is quite clear to the court that the Defendant was arrested (though maybe not formally) the instant his car was stopped on the street.

However, it is equally clear that the officers had probable cause to arrest the Defendant at that moment. As the Supreme Court has stated, "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are factual not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). The officers at the roadside stop possessed all of the information contained in the affidavits and applications for the search warrants. In addition, Lieutenant Brown, who had identified the Defendant from the photograph and had known the Defendant for nearly 25 years, was present at the scene. His personal knowledge of the Defendant's appearance and previous positive identification of him from the surveillance photograph provides additional firsthand knowledge to the officers at the scene. The Defendant's seizure by police officers was proper and supported by probable cause.

The subsequent search of his person and the removal of his wallet was conducted as a search incident to arrest. In fact this search was not conducted until after bait money had been located inside the house and the Defendant was formally placed under arrest by Agent Willis. In any event, the arrest was not illegal, the search was proper, and the evidence seized was in no way tainted by illegal conduct of the police officers.

## III. Scope of the Warrant to Search the Defendant's Residence.

■■■ Defendant's final argument concerns the search of the woodpile outside his house. He argues that a warrant describing and authorizing the search of his house does not

authorize the search of the fenced property surrounding the house. Defendant cites no authority that would support such a conclusion.

Given the common sense and rational approach that is to be taken in situations such as this one, the court notes that the expectation of privacy within one's home is much greater than outside in the yard. The search warrant in this case authorized intrusion into the area of highest expectation of privacy. It seems logical and reasonable that a search warrant that authorizes intrusion on this greater area of privacy would include authorization for intrusion in the lesser area of privacy, the backyard. It is a basic rule of logic that the greater generally includes the lesser. That canon appears to fit tightly into the problem the court now faces.

The warrant in this case carefully and completely described the location of the residence to be searched. All that is required is sufficient information "such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925). The warrant in this case described the street number, the location on the street, the kind of siding, the presence of a deck along the back of the house with a screened area on it, and the location of the driveway for the residence. There is no question but that this warrant sufficiently described the property to be searched.

Plain reading and common sense are the landmarks for the execution and interpretation of the language in a search warrant. As discussed earlier, there is no room in the midst of a criminal investigation for hypertechnical reading or interpretation of a search warrant. *See also United States v. Napoli*, 530 F.2d 1198, 1199 (5th Cir.) *cert. denied* 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976). In that case, the object of the search warrant was the package that had been earlier discovered to contain LSD. The package was delivered to that defendant's residence under controlled circumstances. The search warrant authorized the search of the "premises known as 3027 Napoleon Avenue." As the court noted, "[t]he ultimate or immediate destination of the movable contraband, ... was neither known nor knowable in advance." *Id.* at 1199. The court found the circumstances of the search for the contraband and the language of the warrant sufficient to authorize the search of the camper parked on the property.

The rationale of the Fifth Circuit in *Napoli* is equally applicable in this case. The warrant authorized the search of the residence of the Defendant. A common sense reading of that license would include the property surrounding the actual house. In addition, there was no way the officers could know in advance where the Defendant might have hidden the gun and the balance of the money stolen from the Bank. The court concludes that the search of the back yard of the residence was authorized by the warrant issued by the Magistrate.

Accordingly, Defendant's motion to suppress as amended is **DENIED.**

SO ORDERED.