STATE of Missouri, Respondent,

v.

Dennis L. WILLIAMS, Appellant.

No. 22994.

Missouri Court of Appeals,
Southern District,
Division One.

March 24, 2000.

Motion for Reconsideration or Transfer to
Supreme Court Denied April 18, 2000.

Application for Transfer Denied
May 30, 2000.

Marc L. Edmondson, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, tried as a persistent offender, § 558.016.3, RSMo 1994, was found guilty by a jury of the class C felony of stealing cattle, § 570.030, RSMo Cum.Supp.1997.[1] The trial court sentenced Appellant to sixteen years' imprisonment.

Seeking reversal, Appellant claims in this appeal that the evidence was insufficient to support the verdict, that certain evidence was erroneously received, and that the verdict-directing instruction was flawed in three respects.

This court first addresses Appellant's fifth point—his challenge to the sufficiency of the proof. Appellant maintains the trial court erred in denying Appellant's motion for judgment of acquittal at the close of all the evidence in that "the State failed to prove Appellant, either as a principal or an accomplice, committed the crime of stealing as alleged in the Second Amended Felony Information."

The information referred to by Appellant averred, *inter alia*, that on or about February 18 or 19, 1998, he, acting alone or in concert with another, stole "nine head of Charolais cows and one Angus cow" owned by Gary Harshaw.

■ The standard for appellate review of the sufficiency of the evidence to support a criminal conviction is set forth in *State v. Grim*, 854 S.W.2d 403 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). The appellate court accepts as true all evidence favorable to the State, including all favorable inferences therefrom, and disregards all evidence and inferences to the contrary. *Id.*, 854 S.W.2d at 405. Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the accused guilty beyond a reasonable doubt. *Id.* That standard applies where—as here—a conviction rests on circumstantial evidence. *Id.* at 405–07[2]. In applying the standard, an appellate court neither weighs the evidence nor determines any witness's credibility. *State v. Watson*, 968 S.W.2d 249, 252[1] (Mo.App. S.D.1998).

Viewed according to the above standard, the evidence established that Gary Harshaw, a farmer, bought twenty-two cattle (eleven cow-calf pairs) in January 1998. Ten pairs were Charolais; one pair was black Angus. Harshaw paid $850 for each pair.

Harshaw placed the cattle in a pasture owned by his mother in western Lawrence County, about five miles from his home. He went to the pasture to check the cattle every two or three days.

Just before sundown February 18, 1998, Harshaw went to the pasture and fed the

---

1. Section 570.030, RSMo Cum.Supp.1997, reads:

 "1. A person commits the crime of stealing if he appropriates property ... of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion.

 ...."

3. Stealing is a class C felony if:

 ...

 (3) The property appropriated consists of:

 ...

 (i) Any animal of the species of ... cattle...."

cattle, a chore that required ten to fifteen minutes. All twenty-two cattle were there.

On February 19, 1998, Allen Fryar was employed at North Arkansas Livestock Auction ("NALA") in Green Forest, Arkansas, as a "yard man and barn man." Fryar lived "behind the sale barn" in a house NALA furnished him.

About 5:30 a.m. that day—some twelve to thirteen hours after Harshaw fed and counted his cattle—Fryar walked from his house to a cafe in "the front of the barn" to eat breakfast. As he strolled "through the middle of the barn," he saw a pickup with an attached livestock trailer on "the east side of the parking lot." He was unable to see whether anyone was in the pickup, and he did not approach it to investigate.

Later, after finishing breakfast, Fryar saw Cumy Knight, a "write-up person" employed by NALA, unloading cattle from the trailer.

Knight arrived for work about 6:55 a.m. that day. She saw the pickup and trailer "waiting to be serviced." Recalling the incident at trial, Knight testified:

"I parked my pickup and got out and they pulled up and a man got out and so we had to open up the gate. So we opened the gate and ... this man drove through and the man that got out helped me set up the gate behind them, because I was the only one there, there wasn't my tagger or my gate opener wasn't there yet, because I was the first one there that morning."

Asked whether any other customers were waiting to unload cattle, Knight answered, "Nobody was there but just this trailer[.]"

The man who assisted Knight with the gate had exited the pickup on the "passenger side." This opinion henceforth refers to him as "the passenger." The driver remained inside the pickup. Knight "didn't pay any attention to [the driver]."

Asked whether she could observe the passenger's "features," Knight responded:

"We was working right there together. He helped me set up the gates and we unloaded ... the cows first. I set my gates up ... so I would have the chute open and then we had the gate shut behind them. Then we undid the trailer gate and let the cows out, ran them in and at the time I asked him ... if he knew the pairs on them and he said, No, he didn't.[2] So I thought ... I will pen the cows by themselves ... and pen the calves by themselves and so he waited for me to open a gate up in the barn and I opened the gate and then I opened the gate to the chute and we ran the cows into this pen and then I shut the gate on them. And then we went back there and opened up the gate that was inside that had the calves penned in the front and we let them out, ran them up there and put them in another pen right by the side of the cows."

Knight avowed there were nine Charolais cows, nine Charolais calves, one black cow, and one black calf.

Knight asked the passenger "who he wanted the check made to." He handed her a piece of paper bearing the name Ruby Williams and an address of Post Office Box 663, Seymour, Missouri 65746.

Asked how long she spent with the passenger, Knight replied:

"I would say 20 to 30 minutes ... I don't know for sure ... I didn't time myself because I was doing the job ... that most of the time other people help me do so it would take me longer ... to do it by myself than it would have if I would have had help."

---

**2.** Knight explained the importance of knowing which cow was the mother of which calf, telling the jury:

"[If] you didn't know which [calf] went with which cow ... you couldn't sell them [as separate cow-calf pairs] because [the calves] wouldn't suck the mothers. If you got the wrong calf to the wrong cow then the calf would starve to death."

After the cattle were unloaded, Fryar saw the pickup and trailer depart, heading west toward Berryville.

About 8:30 a.m. that day (February 19), Harshaw received a call from his brother, who told Harshaw he "didn't have no cows left."

Harshaw went to the pasture; he found only one cow and one calf. He called the "sheriff's department," then called a stockyard in Joplin. Someone there gave him the names of other "sale barns," including NALA.

Harshaw phoned NALA and described his missing cattle. According to Harshaw, the person to whom he spoke said, "[T]hey are here, sir."

Rick Abney, an investigator with the Lawrence County Sheriff's office, drove to NALA, accompanied by Harshaw. The journey, according to Harshaw, was "over 100 [miles] or in that neighborhood." Upon arrival, Harshaw identified his cows and calves.

With permission of an officer of the "Arkansas State Police" and the cooperation of NALA, Abney arranged for Harshaw's cattle to be offered for sale at auction. Abney testified:

> "[W]e ran [Harshaw's] cattle through for the simple fact, even though the person that brought the cattle said mail the check, we thought ... a lot of times people show back up to pick up the check instead of mailing it.... We will wait and have [Harshaw's] cattle sold last and we made sure that the bid price was run up to make sure nobody else bought the cattle.... [T]hat was the idea to sell the cattle to produce the dollar amount and to see if someone would show up for the check."

After the pretended sale, no one came forward to claim the proceeds. Harshaw "paid a man and we hauled [the cattle] home."

The next day (February 20, 1998), NALA's bookkeeper issued a check pay-

able to Ruby Williams and mailed it to Post Office Box 663, Seymour, Missouri. The mailing was sent "certified with a return."

Jess Croney is postmaster at Seymour, Missouri. On January 22, 1998—about four weeks before Harshaw's cattle were stolen—Ruby Williams, whom Croney had known several years, appeared at the Seymour Post Office. Ruby[3] was accompanied by a man with whom Croney was unacquainted.

The man told Croney he wanted to rent a post office box. Croney had the man fill out a written application. The man wrote "Dennis L. Williams" on it.

Because Croney did not know the man, Croney asked to see his driver's license. The man showed Croney a Missouri driver's license bearing the name Dennis L. Williams and an address of Route 2, Stockton, Missouri 65785.

At trial, Appellant's driver's license was received in evidence. It displayed the same name, address and driver's license number as the one shown Croney.

Croney rented the man post office box 663 and issued him a single key. However, Croney explained that anyone who arrived at the post office with the key could open the box. The rental agreement allowed Ruby to "receive mail through the box."

Corporal Roger Renken of the Missouri State Highway Patrol was one of several investigators looking into "a rash of cattle thefts in southwest Missouri" in February 1998.

On February 23, 1998, Renken and Abney established surveillance of the Seymour Post Office to see who would pick up the certified mailing from NALA to Ruby. Renken explained:

> "I was waiting for someone to pick the letter up. It was a registered piece of mail and they would have been required

---

**3.** Because Ruby Williams's surname is the same as Appellant's, this opinion henceforth refers to her by her forename. No disrespect is intended.

to bring a receipt ... to the clerk to receive [that] piece of mail."

About 11:00 a.m., a man entered the post office and removed the "yellow slip" from box 663. The slip had to be presented to a postal clerk to obtain the NALA mailing. The man left the post office with the slip. Renken did not follow him because, said Renken:

"I didn't want to lose a surveillance team because the target of our surveillance wasn't the actual slip it was the letter that was mailed by [NALA]."

Later that day, Karlen Kelley appeared at the post office and presented the slip. Kelley signed the name "John Sloan" to a receipt for the NALA mailing, and a postal clerk handed the NALA mailing to Kelley.

Renken and Abney followed Kelley outside. Kelley entered a vehicle. Renken, driving a pickup[4] and accompanied by Abney, tailed Kelley.

Kelley drove to Springfield, where he was stopped by an officer of the Missouri State Highway Patrol and arrested. Another officer drove Kelley's vehicle to Troop D headquarters, where it was searched.

The NALA mailing was found on "the passenger side floorboard." Officers also seized a set of bolt cutters and a "hedge stick" four to five feet in length, described as "a sorting stick for cattle."

On March 2, 1998, Joe Stropp, a "livestock enforcement officer" for the Missouri Department of Agriculture, showed photographs of 24 men to Knight. The photographs were mounted on four pasteboard "folders," six photographs on each folder. A photograph of Appellant was one of the six on a folder received in evidence at trial as State's Exhibit 6.

Knight identified Appellant's photograph as a photograph of the passenger who helped her unload Harshaw's cattle and instructed her to send the check to Ruby.[5]

Almost a year later, Knight identified Appellant in the courtroom at trial[6] as the passenger described above.

The law pertinent to Appellant's claim that the evidence was insufficient to support the verdict is well settled.

 Unexplained possession of recently stolen property is sufficient to support a conviction of stealing it. *State v. Chase,* 444 S.W.2d 398, 402–03[4] (Mo. banc 1969). Such possession may be a joint possession of the accused and others. *State v. Cobb,* 444 S.W.2d 408, 412[5] (Mo. banc 1969). However, in *State v. Farmer,* 490 S.W.2d 72 (Mo.1973), the court, in reversing a burglary and stealing conviction where the accused was one of three occupants of an automobile in which recently stolen property was found, said: "Where there is only a joint possession of recently stolen property our recent affirmances have all contained something additional which ties defendant to the burglary and stealing." *Id.* at 74.

 Here, Appellant and someone else—the unidentified pickup driver—had possession of Harshaw's cattle in Green Forest, Arkansas, some twelve to thirteen hours after Harshaw last saw the cattle in Lawrence County, Missouri. The cattle had obviously been stolen at night, as Harshaw fed them just before sundown. During darkness, the cattle were removed from the pasture and hauled some 100 miles to NALA.

The interval between the time Harshaw last saw his cattle and the time Appellant

---

4. The pickup "wasn't a marked vehicle."

5. Knight signed her name on the reverse side of Exhibit 6 when she identified Appellant's photograph. Stropp watched her sign. Then, according to Stropp, "we dated it and timed it." There is a handwritten date "March 2, 1998" below Knight's signature, followed by a handwritten time "1:30 p.m."

Appellant's brief states Stropp showed the photographs to Knight on or about March 3, 1998. Appellant's brief conflicts with Exhibit 6.

6. The case was tried February 24–25, 1999, in Stone County on change of venue from Lawrence County.

was seen in joint possession of them is shorter than the interval in *State v. Feeler*, 634 S.W.2d 484 (Mo.App. S.D.1981), where this court affirmed a theft conviction based on the accused's possession of stolen calves six days after their owner discovered them missing. *Id.* at 486. In *Feeler*, the calves were taken to a livestock auction some 65 miles from where they were pastured instead of a closer one. *Id.* In that respect, *Feeler* is like the instant case, where Harshaw's cattle were taken to an Arkansas stockyard far more distant from where they were pastured than the Joplin stockyard.

Assuming that *Farmer*, 490 S.W.2d at 74, requires "something additional" in order for this court to hold the evidence sufficient to support Appellant's conviction, this court identifies the following additional incriminatory evidence.

First, Appellant arrived at NALA with Harshaw's cattle sometime before 5:30 a.m. That was before daybreak and about an hour and a half before NALA opened for business. The jurors could reasonably conclude there was no reason to arrive that early except to be off the public highways with the stolen cattle before daylight.

Second, instead of waiting at NALA until the cattle were sold, Appellant departed as soon as they were unloaded. He directed Knight to make the check payable to Ruby. The address he furnished Knight was a post office box he rented some four weeks earlier. The sole key to the box was issued to him. The only other person authorized to receive mail through the box was Ruby, who accompanied him when he rented it. The jurors could reasonably infer from those circumstances that Appellant wanted to make it as difficult as possible to trace Harshaw's cattle to him, yet also wanted to ensure he received the proceeds of the theft.

Appellant presents an impassioned argument that there was no direct evidence he participated in the theft. However, the State, in this circumstantial evidence case, was not required to produce such proof. Applying *Chase*, 444 S.W.2d at 402–03[4],

*Cobb*, 444 S.W.2d at 412[5], *Farmer*, 490 S.W.2d at 74, and *Feeler*, 634 S.W.2d at 486, this court holds Appellant's joint possession of Harshaw's recently stolen cattle, together with the additional circumstances enumerated above, was sufficient to support the guilty verdict. Appellant's fifth point is denied.

This court next considers Appellant's third point, which reads:

"The trial court erred in allowing evidence concerning the photographic lineup and in-court identifications of Appellant by witness Knight because this evidence violated Appellant's rights to due process of law and a fair trial in that the photographic lineup was unduly suggestive and the identifications were unreliable and the subsequent in-court identifications were tainted by the photographic lineup."

Appellant filed a pretrial motion to suppress his identification by Knight. The trial court heard evidence on the motion two weeks before trial. Two witnesses testified: Stropp (who had presented the 24 photographs to Knight March 2, 1998) and Knight. Both were called by the State; each was exhaustively cross-examined by Appellant's lawyer. The 24 photographs were received in evidence.

At the conclusion of the evidence, the trial court denied the motion.

Appellant renewed the motion at trial. The trial court again denied it.

As reported earlier, Knight identified Appellant in the courtroom at trial.

Appellate review of a trial court's denial of a motion to suppress is limited to a determination of whether sufficient evidence exists to support the trial court's ruling. *State v. Wise*, 879 S.W.2d 494, 503[1] (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To exclude identification testimony, an accused must show: (1) the pretrial identification procedure was impermissibly suggestive, and (2) the suggestive procedure made the identification at trial unreli-

able. *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. banc 1990). An appellate court need not consider requirement 2 if the accused fails to fulfill requirement 1. *Id.*

■ Appellant maintains he fulfilled requirement 1 in that most of the photographs Stropp showed Knight were of men who did not resemble Knight's description of the passenger. Appellant also points out that his photograph was one of only six in black-and-white; the other eighteen were in color.

Having read the record and examined the photographs, this court rejects Appellant's claim that the photographic identification procedure was impermissibly suggestive.

Stropp testified that when he assembled the 24 photographs, there were three suspects: Appellant, Kelley and a third man. Only one photograph of each suspect was among the 24.

An attentive reader will recall Appellant's photograph was one of six on a folder received in evidence at trial as State's Exhibit 6. Neither of the other suspects resembled Appellant, hence Appellant's photograph was the only photograph of a suspect on Exhibit 6.[7]

Like Appellant's photograph, the other five on Exhibit 6 are black-and-white. Each shows a Caucasian male wearing glasses. Four have hair that appears darker than Appellant's; one has hair that appears lighter. The men appear to be of various ages; none appears elderly or adolescent. Appellant appears to be neither the eldest nor youngest. None of the six appears to have any scar or other unique characteristic that would distinguish him from the others.

■ To the extent that Appellant's features differ from those in the other five photographs, the differences are merely those which set one individual apart from another. Dissimilarity in physical appearance alone is insufficient to establish im-

permissible suggestion. *State v. Cooks*, 861 S.W.2d 769, 772[4] (Mo.App. E.D. 1993). As aptly observed in *State v. Montgomery*, 596 S.W.2d 735, 737 (Mo.App. E.D.1980), persons in a lineup will never be identical to one another (unless, of course, the lineup includes identical twins). The law does not require exact conformity to ensure an untainted identification procedure. *Id.*

Furthermore, the record is bare of any indication that Stropp presented the photographs to Knight in such a way as to emphasize any of the 24. He handed all four folders to her and, after she identified Appellant as the passenger, Stropp did not tell her who Appellant was or "give her any hint" that she had identified one of the suspects. Thus, Knight's later in-court identification of Appellant was not tainted by anything Stropp said, either before or after Knight picked out Appellant's photograph.

For the above reasons, this court holds Appellant failed to fulfill requirement 1 of the *Vinson* test, 800 S.W.2d at 446, i.e., that the pretrial identification procedure was impermissibly suggestive. Because of that, this court need not consider requirement 2 of the *Vinson* test. *Id.*; *State v. Bullington*, 684 S.W.2d 52, 55 (Mo.App. W.D.1984). Appellant's third point is denied.

■ Appellant's fourth point avers the trial court committed reversible error in receiving the 24 photographs in evidence and permitting the prosecutor to display them to the jury. Appellant complains that his photograph was a mug shot and constituted evidence of his "other crimes and prior law enforcement contacts."

At trial, Appellant's lawyer called Stropp as a witness for Appellant, endeavoring to establish discrepancies in Knight's description of the passenger and to convince the jurors Knight was not positive

7. Kelley's photograph appeared on another folder with photographs of five non-suspects. The third suspect's photograph likewise ap-

peared on a folder with photographs of five non-suspects.

that the photograph she identified was the passenger.

On cross-examination, the prosecutor had Stropp identify the 24 photographs. Stropp testified Knight identified Appellant's photograph as the passenger. The prosecutor then offered the 24 photographs in evidence.

Appellant's lawyer objected because Appellant's photograph "shows height identifiers like it's a booking photo," whereas "not all of [the other 23 photographs] are mug shots."

The trial court required the prosecutor to place a "tab" beneath each of the 24 photographs to conceal its source.[8] Once that was done, the trial court received the photographs in evidence and allowed the jurors to look at them.

The law governing Appellant's fourth point appears in *State v. Blaney*, 801 S.W.2d 447, 450[5] (Mo.App. E.D.1990)[9]:

> "As a general rule mug shots may be admitted into evidence and viewed by the jury when all identifying information is masked and when the defendant's identity is in issue and they will help the jury determine the accuracy of the identification. *State v. Luckett*, 770 S.W.2d 399, 403 (Mo.App.1989). However, where the mug shots or the testimony by which they are identified discloses a defendant's prior arrest or convictions, their admission constitutes prejudicial evidence of other crimes. *State v. Quinn*, 693 S.W.2d 198, 200 (Mo.App. 1985)."

Appellant cites *State v. Motley*, 740 S.W.2d 313 (Mo.App. E.D.1987), where six photographs (including one of the accused) showed "St. Louis Police Department" and an identification number. *Id.* at 317. The appellate court held the trial court erred in receiving the "unmasked" photographs in evidence because the "inculpatory information" was not removed. *Id.*

Here, the tabs concealed the source of the photographs so well that this court cannot determine the source of any of them. Nonetheless, Appellant avers his photograph "still displayed the height markers typical of booking photos."

 Appellant's complaint is no reason for reversal. Even if a juror inferred from the "height markers" in Appellant's photograph that it had been taken by a law enforcement agency, such inference would not warrant a new trial. That a police department has a photograph of a defendant in its files does not imply that the defendant has committed prior crimes. *State v. Young*, 943 S.W.2d 794, 798[17] (Mo.App. W.D.1997); *State v. Tivis*, 933 S.W.2d 843, 846[6] (Mo.App. W.D.1996). Appellant's fourth point is meritless.

Appellant's two remaining points—his first and second—attack Instruction 5, the verdict-directing instruction. Instruction 5, drafted from MAI–CR 3d 304.04 (7–1–97) and MAI–CR 3d 324.02.1 (10–1–98), read:

> "A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.
>
> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about the 18th or 19th day of February, 1998, in the County of Lawrence, State of Missouri, the defendant, acting either alone or in concert with another took, nine charolais and one angus cow, and
>
> Second, that defendant did so without the consent of Gary Harshaw, and,
>
> Third, the defendant did so for the purpose of withholding the cattle from the owner permanently, and,

---

8. This court infers from the record that some of the photographs, beneath the face of the man depicted, showed the photograph had been taken by a law enforcement agency.

9. A holding in *Blaney* on an unrelated point was overruled in *State v. Withrow*, 8 S.W.3d 75, 78–79 n. 3 (Mo. banc 1999).

Fourth, that the property taken, was cattle, then you are instructed that the offense of stealing has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of that stealing, the defendant acted together with or aided other persons, in committing that offense, then you will find the defendant guilty of felony stealing.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense."

Appellant's first point:

"The trial court erred in submitting Instruction Number 5 to the jury without requiring the jury to find that the property was 'of another' because the instruction, as given, violated Appellant's rights to due process of law and a fair trial in that the State's burden of proof was lowered by the omission of the essential element and it does not effectively bar a subsequent prosecution."

▆ Appellant's first point is based on MAI–CR 3d 324.02.1, the pattern instruction for stealing without consent. In the pattern instruction, paragraph "First" includes a hypothesis that the property taken was: "(owned by) (in the possession of) (in the charge of) (operated by) (provided by) [name of victim]."

As reported in the fourth paragraph of this opinion, the information on which Appellant was tried averred the cattle he allegedly stole were owned by Harshaw. A close reading of Instruction 5 reveals that paragraph First includes no hypothesis that the cattle were owned by anyone.

In *State v. Fowler*, 938 S.W.2d 894, 897 (Mo. banc 1997), cited by Appellant, the court held that in a stealing prosecution the State must prove the property belonged to another. Appellant reminds this

court that a verdict-directing instruction must require a finding of all the constituent facts necessary to constitute an offense in order to support a conviction. *State v. Newhart*, 503 S.W.2d 62, 69[12] (Mo.App. 1973). Appellant maintains that because Instruction 5 did not require the jury to find the cattle described in paragraph First were the property of another, Instruction 5 did not require a finding of all constituent facts necessary to constitute stealing.

Rule 28.03 [10] provides, *inter alia*, that no party may assign as error the giving of an instruction "unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.''

The State points out—and Appellant concedes—that the attack on Instruction 5 in his first point was not raised by him in the trial court before the jury retired to consider its verdict. Consequently, the claim of error is not preserved for review. *State v. Carlile*, 9 S.W.3d 745, 753–54 (Mo. App. S.D.2000); *State v. Martindale*, 945 S.W.2d 669, 673[2] (Mo.App. E.D.1997). As emphasized in *Martindale*: "A defendant cannot stand idly by, permit the giving of an erroneous instruction, and then benefit from [his] inaction." *Id.*

▆ Recognizing that barrier, Appellant asks this court for "plain error review under ... Rule 29.12(b)." Relief under that rule is appropriate only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice results. *State v. Isa*, 850 S.W.2d 876, 884[2] (Mo. banc 1993).

This court finds no basis for plain error relief.

First, there was no dispute at trial about who owned the cattle Appellant was accused of stealing. Harshaw's testimony that he owned them was uncontradicted.

Second, there was no dispute at trial that someone stole Harshaw's cattle and

---

10. References to rules are to Missouri Rules of Criminal Procedure (1999).

hauled them to NALA for sale. Indeed, Appellant's lawyer, in closing argument, told the jurors:

"I told you we weren't going to prove in this case who ... was guilty of this crime. That is not my job, that is not Mr. Williams' job to prove who is guilty in this case.... I am not going to be able to prove to you who did this crime and who is responsible for it or who set it up or who in [the prosecutor's] words, 'was the mastermind.' But we are not required to do that."

Those remarks tacitly concede the crime with which Appellant was charged was committed by someone. Appellant sought acquittal on the premise that the evidence was insufficient to establish beyond a reasonable doubt that he was the culprit.

Third, paragraph Second of Instruction 5 hypothesized that Appellant took the cattle described in paragraph First "without the consent of Gary Harshaw."

In *State v. McCauley*, 522 S.W.2d 152 (Mo.App.1975), the accused was convicted of possessing marijuana. *Id.* at 153. One of his claims of error on appeal was that the verdict-directing instruction was flawed because it allowed the jury to find him guilty without first finding that the substance he allegedly possessed was marijuana. *Id.* at 154. In *McCauley*, as here, the point was not preserved for review. *Id.* Affirming the conviction, the appellate court held the jury could not have been misled about the nature of the substance, as there was no question that the proof showed it was marijuana. *Id.* at 154–55[4].

The same rationale applies here. There was no dispute that the cattle belonged to Harshaw and no dispute that someone stole them. Paragraph Second of Instruction 5 hypothesized the cattle were taken without Harshaw's consent. Given those circumstances, the failure of paragraph First in Instruction 5 to hypothesize that the cattle were owned by Harshaw did not result in manifest injustice or miscarriage of justice. Appellant's first point is denied.

Appellant's second point levels two more attacks on Instruction 5. Both are based on MAI–CR 3d 304.04. Paragraph 2 of the Notes on Use for MAI–CR 3d 304.04 reads:

"This instruction provides for the modification of the ordinary verdict directing instruction for an offense to cover the situation where the liability of the defendant is dependent upon his being responsible for the conduct of another person by virtue of being an 'aider and abettor.'"

Paragraph 4 of the Notes on Use recognizes there are an almost infinite number of variations in factual situations of accessorial liability. However, paragraph 4 explains: "[T]he evidence in most cases will involve one of four situations."

Paragraph 5 of the Notes on Use lists the four situations. One of them is subparagraph "c": "Where it is not clear whether the conduct elements were committed by the defendant or another person." The guidelines for that situation are:

"Where the evidence is not clear or conflicts as to which person (in a group including the defendant) engaged in the conduct constituting the offense, then

(1) those conduct elements of the offense should be ascribed to the defendant *or* the other person or persons, and

(2) select one of the alternatives such as 'acted together with or aided' in the paragraph following 'then you are instructed that the offense of [*name of offense*] has occurred....'

This method of submission will apply in such cases where it is not clear whether the defendant acted alone or had an accomplice as where the defendant is found in possession of stolen items in the vicinity of a recently burglarized store but it is not clear whether he alone committed the burglary or was acting with another person or persons. Modify the instruction by using 'acted alone or acted together with or aided' in the paragraph following 'then you are

instructed that the offense of [*name of offense* ] has occurred....' "

■ Appellant's theory of error, as this court divines it, is that the evidence did not show who "took" Harshaw's cattle or whether the taker acted alone, hence paragraph First of Instruction 5 should have hypothesized that Appellant or another took the cattle. Furthermore, says Appellant: "[T]he language 'acting in concert' [sic] should not have been included." Appellant also argues: "As the [prosecutor] submitted the case, including paragraph second and third had no evidentiary support and were improperly submitted."

This court finds no merit in those complaints. Paragraph First of Instruction 5 hypothesized that Appellant, either by himself or in concert with someone else, took the cattle. Paragraph Second hypothesized that Appellant did so without Harshaw's consent. Paragraph Third hypothesized that Appellant did so for the purpose of withholding the cattle from the owner permanently. Thus, Instruction 5 required the State to prove Appellant personally engaged in all of the conduct constituting the stealing.

The State points out that subparagraph "d" of paragraph 5 of the Notes of Use for MAI–CR 3d 304.04 explains:

"Where the evidence shows the conduct constituting the elements of the offense was committed solely by the defendant and there is also evidence that someone aided the defendant, there is no need to use MAI–CR 3d 304.04 because the ordinary verdict directing instruction for the offense is sufficient to submit the defendant's liability. However, MAI–CR 3d 304.04 can be adapted to

cover this situation, but using it puts an additional and unnecessary burden on the prosecution."

■ By including in paragraph First of Instruction 5 the hypothesis that Appellant, "acting either alone or in concert with another" took Harshaw's cattle, the State cast an unnecessary burden on itself.[11] An instruction that puts an additional burden on the State beyond that which is legally required in order to establish guilt is not prejudicial to the accused. *State v. Livingston,* 801 S.W.2d 344, 350[6] (Mo. banc 1990). This court therefore denies Appellant's first attack on Instruction 5 in his second point.

The second attack on Instruction 5 in Appellant's second point is that the opening paragraph should have been modified to hypothesize that whatever aid, if any, Appellant provided in the theft of Harshaw's cattle "was provided before or during the commission of the crime." Appellant proclaims that Instruction 5 allowed the jury to find him guilty if they believed he merely "became involved after the cattle had been removed from the farm."

■ Appellant bases that attack on paragraph 8 of the Notes on Use for MAI–CR 3d 304.04. It reads, in pertinent part:

"For accessory liability, the assistance or encouragement by the defendant must occur before or during the commission of the offense. In cases where, in addition to evidence of the defendant's assisting or encouraging before or during the offense, there is evidence of assistance or encouragement occurring after the offense has been completed, and the defendant contends that the only

11. Although the burden was unnecessary, there was ample evidence to support the disjunctive submission. As explained in this opinion's denial of Appellant's fifth point, his unexplained joint possession of Harshaw's recently stolen cattle, coupled with the other incriminatory evidence identified in that discussion, was sufficient to support a finding that Appellant stole the cattle. There was also ample evidence to support a finding that someone helped him. It took two people— Appellant and Knight—some 20 to 30 minutes

to unload the cattle at NALA in daylight. Inferably, it would take longer than that for two people to capture the cattle in the pasture at night and load them in the trailer. Even more time would be required if the thief acted alone. The jurors could therefore have reasonably concluded that Appellant, in order to round up the cattle and flee as quickly as possible, enlisted another to aid him. Such an inference is bolstered by the presence of the unidentified driver in the pickup pulling the trailer carrying the cattle.

aid, if any, provided by the defendant occurred after the offense was completed, then, on request of the defendant, the opening paragraph of this instruction will be modified to read as follows:

[The language for modifying the opening paragraph appears here.]"

The modification called for in the above-quoted passage is clearly inapplicable here. The modification is to be made only where "the defendant contends that the only aid, if any, provided by [him] occurred after the offense was completed."

Appellant presented no evidence that he provided aid only after the theft was completed, and he did not claim the State's evidence supported such a finding. His theory of defense was that the evidence was insufficient to establish that he was the passenger or that he was otherwise involved in the theft.

Appellant's second attack on Instruction 5 in his second point is patently meritless.

Judgment affirmed.

PARRISH and SHRUM, JJ., concur.