STATE of Missouri, Respondent,

v.

William POTTER, Appellant.

No. 24145.

Missouri Court of Appeals,
Southern District,
Division One.

April 24, 2002.

Ellen H. Flottman, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Chief Judge.

Following a bench trial in the Circuit Court of Camden County,[1] William Potter (Defendant) was convicted of the Class B felony of manufacturing a controlled substance, § 195.211 RSMo (2000). Defendant was sentenced as a prior and persistent drug offender to fifteen years in the Missouri Department of Corrections. He appeals his conviction and sentence.

Defendant raises two points of trial court error. In his first point, Defendant contends that the trial court erred in entering its judgment of guilt and in sentencing Defendant because the State did not present sufficient evidence from which the trial court could have found him guilty beyond a reasonable doubt of manufacturing methamphetamine. In his second point, Defendant asserts the trial court erred in overruling his motion to suppress the evidence resulting from the seizure of evidence pursuant to a search warrant of his residence. He contends that the seizures were outside the scope of the search authorized by the search warrant.

The standard of review in a court tried case is the same standard applied in a jury-tried case. *State v. Condict,* 952 S.W.2d 784, 785 (Mo.App.1997). Our review is limited to whether there is sufficient evidence from which the trier of fact could have found the accused guilty as charged. *State v. Creech,* 983 S.W.2d 169, 170 (Mo.App.1998). "We accept as true all evidence, direct and circumstantial, and all reasonable inferences supportive of the judgment, disregarding the contrary evidence." *Id.* In applying the standard, we do not determine any witness' credibility. *State v. Williams,* 18 S.W.3d 425, 427 (Mo. App.2000).

---

1. The case was tried in Camden County after a request for change of venue from Morgan County was granted.

Viewed in a light most favorable to the trial court's verdict as we must, *Creech*, 983 S.W.2d at 170, the record shows that in the late evening of December 7, 1998, the Morgan County Sheriff's Office received information from the Pettis County Sheriff's Office that Defendant was going to "cook" some methamphetamine. The Pettis County deputies received their information from a reliable informant. Based upon this information, several Morgan County deputies went to Defendant's residence. Defendant was living in a garage ("garage-home") described as being "[m]aybe 15 × 20, maybe a little bigger. [It was] fairly small." The garage-home was located between two vacant house trailers, all of which were located at 1070 Blueberry Drive in Otterville, Morgan County, Missouri. Officers were hoping to obtain Defendant's consent to search the premises.

The officers arrived at Defendant's residence around one o'clock in the morning of December 8, 1998. In order to reach the entrance from the driveway, they were required to walk around the back of the garage-home. Behind the garage-home officers observed a burn pile containing toilet paper, paper towels, "Coleman" fuel cans, "Heet" cans, and plastic tubing.

One deputy knocked on the door and identified himself. The Defendant said "come on in," and the deputy stepped inside. Defendant was the only one at the home. Once inside the garage-home the deputy observed in plain view a yellow bucket that the Pettis County informant had described as being located at the residence. The deputy also noticed in plain view "Coleman" fuel cans, tubing, and coffee filters. The deputy told Defendant that they had information that he was

"cooking methamphetamine" and asked Defendant for permission to search his residence. Defendant denied that he was cooking methamphetamine and refused the request to search his residence. Defendant was then arrested.[2] The officers locked the residence with Defendant's keys and left one deputy on site.

Subsequently, a search warrant was obtained. The search warrant permitted officers, *inter alia*, to search Defendant's garage-home which sat "approximately 50 yards off of Blueberry Drive." The warrant also authorized the search of two house trailers. One was a "white vacant house trailer" that sat about "20 yards from the above described garage-home" and located "to the northwest of the above described garage." The other, a smaller "off white vacant house trailer," sat some "100 yards to the north of the above described garage home." The garage-home and the two house trailers were described as being located at 1070 Blueberry Drive, Otterville, Missouri.

The warrant authorized police to seize various items associated with the manufacture or distribution of methamphetamine, including:

A. Methamphetamine and any other controlled substance, as well as drug paraphernalia used in the use and distribution of methamphetamine, and any other controlled substance.

B. Any and all tools, devices, equipment and all forms of apparatus used in the production or manufacture of methamphetamine.

Two of the deputies, as well as a trooper from the Missouri State Highway Patrol, returned to the residence to execute the warrant. The areas inside Defendant's ga-

---

**2.** The record is not precisely clear on what grounds he was arrested. Defendant makes

no issue on this appeal regarding the arrest.

rage-home residence, the two trailer homes, and the outside areas of the garage-home and trailer homes were searched.

As more fully set out below, the record shows that some of the items seized from the garage-home included: glass containers, unknown chemicals, hot plate, and a bag which was found on a bed in the garage-home. The bag contained a small saw, respirator mask, rubberized chemical gloves, flashlight, a pair of bolt cutters, and a hose. During subsequent court hearings, a deputy identified the contents of the bag as an anhydrous ammonia theft kit, that is, the equipment needed to steal anhydrous ammonia.[3]

The deputies also searched two toolboxes, one green and one black, found outside the home but on Defendant's property.[4] The green toolbox contained a can of acetone, two cans of denatured alcohol, a can of Red Devil lye, and a can of liquid fire sulfuric acid.

The black toolbox contained: plastic bags of lithium batteries, box of plastic sandwich bags, coffee grinder, glass retort, bungee cord, measuring cup with a discolored filter inside it, small glass vial, razor blades, pellets, Mason jar with a discolored filter inside it, wooden hand grinder, a light, coffee pot with another glass jar inside, discolored napkins, cardboard box containing a breast pump, pipette, syringe, lock, and a hose clamp. The black toolbox also contained a brown bottle with a red powder substance, a pink substance, and a white substance.

Samples were taken from the chemical substances found in the toolboxes and in-side the garage-home. Although not all substances could be identified, some samples proved to be pseudoephedrine and red phosphorous, commonly used in the process of manufacturing methamphetamine, and methamphetamine itself.

The trooper who accompanied the Morgan County deputies to Defendant's residence had been trained in methamphetamine laboratory identification and methamphetamine production. During court proceedings, he explained the two most common methods of methamphetamine production and the ingredients needed to manufacture methamphetamine. He testified that many of the items found in the tool boxes and in the garage-home were items used in the manufacture of methamphetamine.

In his first point on appeal, Defendant asserts the trial court erred in entering its judgment of guilt because the State failed to provide sufficient evidence to prove beyond a reasonable doubt that Defendant was guilty of manufacturing methamphetamine. Defendant maintains that the State failed to prove that Defendant "was the individual who manufactured methamphetamine at the ... residence which he shared with others."

 "The crime of the manufacture of methamphetamine requires the state to prove the defendant: (1) manufactured methamphetamine and (2) was aware the substance he manufactured was methamphetamine." *Salmons v. State,* 16 S.W.3d 635, 638 (Mo.App.2000); *State v. Dowell,* 25 S.W.3d 594, 603 (Mo.App.2000); *see also* MAI–CR 3d 325.06. "To convict [De-

---

**3.** Testimony revealed that Anhydrous ammonia is an element used in the manufacture of methamphetamine.

**4.** One law enforcement officer described the green toolbox as having been found inside the bed of a pickup truck near the garage-home; another described the green toolbox as having been found beside the same pickup truck. The record further shows that the black toolbox was located some five to ten feet from the garage-home.

fendant] of the manufacturing charge the State must also prove that he had actual or constructive possession of the materials being used to manufacture the controlled substance." *State v. Smith*, 33 S.W.3d 648, 653 (Mo.App.2000).

The Supreme Court of Missouri has used the same standards of actual or constructive possession in manufacturing cases as in possession cases. *See id.* In *State v. Withrow*, 8 S.W.3d 75, 80 (Mo. banc 1999), our high court set out:

> When the accused shares control over the premises ... further evidence is needed to connect him to the manufacturing process. The mere fact that a defendant is present on the premises where the manufacturing process is occurring does not by itself make a submissible case. Moreover proximity to the contraband alone fails to prove ownership. There must be some incriminating evidence implying that the defendant knew of the presence of the manufacturing process, and that the materials or the manufacturing process were under his control.

*Id.* at 80 (citations omitted); *see also State v. Metz*, 43 S.W.3d 374, 379 (Mo.App.2001). "Exclusive possession of the premises containing the material raises an inference of possession and control." *Withrow*, 8 S.W.3d at 80. "Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the materials were found." *Id.*

Here, many of the items seized during the search of Defendant's garage-home and the curtilage of the garage-home, such as: pseudeophedrine, red phosphorous, "Coleman" fuel and stove, acetone, "Red Devil" lye, sulfuric acid, denatured alcohol, glass containers, hot plate, glass tubes, a propane tank with anhydrous ammonia stains on it, valve adapters, lithium batteries, a gas can with a rubber hose connected to it, numerous jars of chemicals and other liquids together with a measuring cup with a discolored filter inside, a syringe, and coffee filters were identified at trial as materials used in the manufacturing of methamphetamine. Additionally, samples of powder and liquid that tested positive for methamphetamine were found inside the garage-home.

Defendant presented evidence showing that he was one of three joint owners of the garage-home. The garage-home had no bathroom nor running water. It had no kitchen, although an area was used for cooking purposes. While Defendant did not testify at trial, his daughter testified that she and another man resided with Defendant. Defendant's mother testified that there were six other people staying with Defendant at this time. Defendant's mother also testified she lived down the road from defendant but did not stay overnight at Defendant's garage-home. No other evidence of other people residing in the garage-home was put forth. Viewing the evidence in a light supportive of the verdict, it is clear the trial court believed that Defendant lived in the garage-home. The trial court is free to believe or disbelieve any testimony. *State v. Carroll*, 41 S.W.3d 878, 883 (Mo. banc 2001). We do not determine any witness' credibility. *Williams*, 18 S.W.3d at 427.

Even if Defendant had joint control of the premises, a defendant is still deemed to have possession and control where there is additional evidence connecting him with the controlled substance. *State v. Norville*, 23 S.W.3d 673, 676 (Mo. App.2000). " 'A defendant's access to an area where drugs are found is an incriminating fact which is not destroyed by another individual's also having access to the area.' " *Metz*, 43 S.W.3d at 380 (quoting

*State v. Parrish,* 852 S.W.2d 426, 428 (Mo. App.1993)).

The record supports the proposition that Defendant had regular access to the area where various materials used in the manufacturing of methamphetamine were found. *Id.; Norville,* 23 S.W.3d at 677. Evidence strongly suggested that Defendant lived in the garage-home. His personal belongings were at the residence. Items such as paper and notebooks with his writing on them were also found. Additionally, he was alone at the garage-home at 1:00 a.m. in the morning. Overall, the evidence presented at trial buttressed the inference that Defendant had regular access to, use or control, whether exclusive or joint, of the garage-home and its immediate environs, thereby supplying the inference of his knowledge of and, at the least, constructive possession of those items used in manufacturing methamphetamine together with the methamphetamine which was found. *Metz,* 43 S.W.3d at 380. There was sufficient evidence presented during trial to support the trial court's verdict finding Defendant guilty beyond a reasonable doubt of manufacturing methamphetamine. *See Dowell,* 25 S.W.3d at 603; *see Metz,* 43 S.W.3d at 380. Point denied.

Defendant's second point asseverates trial court error in overruling Defendant's motion to suppress and admitting into evidence items that were seized from outside his residence because such actions violated his rights of due process of law and freedom from unreasonable search and seizure guaranteed by the Fourth, Fifth and Fourteenth Amendments. Defendant argues that the seizure of items outside the garage-home, including items found in the green and black toolboxes, was beyond the scope of the warrant because the warrant did not mention the yard or curtilage.

 Review of the trial court's denial of Defendant's motion to suppress is based upon the whole record and the totality of the circumstances surrounding its decision and we will affirm the ruling if it is supported by substantial evidence. *Metz,* 43 S.W.3d at 381; *see State v. Middleton,* 43 S.W.3d 881, 884 (Mo.App.2001). We view the facts and reasonable inferences therefrom in the light most favorable to the trial court's ruling disregarding contrary evidence and inferences. *Metz,* 43 S.W.3d at 381. Nonetheless, at a suppression hearing "the burden of going forward with the evidence and risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." *Id.* "The trial court determines the weight of the evidence and the credibility of witnesses, and we will not substitute our discretion for that of the trial court in deciding whether sufficient evidence supporting the trial court's ruling exists." *Id.; see State v. Leavitt,* 993 S.W.2d 557, 560 (Mo.App.1999). "Although we review the facts under a clearly erroneous standard, the issue of whether the Fourth Amendment has been violated is a question of law which we review *de novo.*" *Middleton,* 43 S.W.3d at 884 (quoting *State v. Woolfolk,* 3 S.W.3d 823, 828 (Mo.App.1999)).

As previously set out, while executing the search warrant, a search was made both inside the garage-home and the two mobile homes together with the area immediately outside the garage-home and mobile homes. The two toolboxes and their contents, previously described, were found in the yard approximately five to ten feet from the residence. These toolboxes likewise were identified at trial as containing materials used in the manufacture of methamphetamine.

 "The protection of the Fourth Amendment extends to the curtilage of a person's home." *State v. Adams,* 791 S.W.2d 873, 877 (Mo.App.1990). " 'Curti-

lage' is defined as the enclosed space of ground and buildings immediately surrounding a dwelling house or as a yard, courtyard, or piece of ground, included within the fence surrounding a dwelling house." *Id.* "Curtilage is a right which goes only with a dwelling house as that term is commonly used and understood." *Id.* "Although a defendant is the owner of a given premises, those premises must be within the curtilage of the owner's home if they are to come within the protection of the Fourth Amendment." *Id.; see State v. Edwards,* 36 S.W.3d 22, 26 (Mo.App.2000); *see also Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225.[5]

" '[I]t is altogether proper for police with legitimate business to enter the areas of curtilage open to the public [without a warrant].' " *Edwards,* 36 S.W.3d at 26 (quoting *State v. Kriley,* 976 S.W.2d 16, 22 (Mo.App.1998)). "Of course, whether a particular driveway, walkway, front porch, or other area of the curtilage of the home should be deemed open to the public, and thus subject to warrantless entry by the police must be determined on a case-by-case basis." *Edwards,* 36 S.W.3d at 27.

"[S]everal state courts have held that the Fourth Amendment is not violated by a search of the grounds or outbuildings within a residence's curtilage where a warrant authorizes a search of the residence." *United States v. Gorman,* 104 F.3d 272, 275 (9th Cir.1996); *see Nebraska v. Vicars,* 207 Neb. 325, 299 N.W.2d 421, 425 (Neb. 1980) (warrant to search residence permitted search of calf shed 100 feet from the house on opposite side of chain link fence);

*State v. Trapper,* 48 N.C.App. 481, 269 S.E.2d 680, 684 (N.C.App.1980) (warrant authorizing search of house trailer permitted search of tool shed 30 feet away); *State v. Stewart,* 129 Vt. 175, 274 A.2d 500, 502 (Vt.1971) (warrant to search house permitted search of a tree in the backyard because within the curtilage); *see also Sowers v. Indiana,* 724 N.E.2d 588, 591 (Ind.2000) (warrant authorizing search of residence at a specific address also authorized search of a tent in the back yard); *Kansas v. Basurto,* 15 Kan.App.2d 264, 807 P.2d 162, 165 (1991) (upholding a search of a shed in the backyard of residence, observing "[t]here appears to be little doubt that a search warrant which describes only the residence of a defendant will authorize the search of any vehicles or buildings within the 'curtilage' of that residence."). The *Gorman* court also reprised the United States Supreme Court's rationale in *United States v. Ross,* when that court observed:

> A warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search.

*Gorman,* 104 F.3d at 275 (quoting *United States v. Ross,* 456 U.S. 798, 821, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982)).

5. "Four factors are to be considered in determining the extent of a home's curtilage, which enjoys a higher expectation of privacy: (1) the proximity of the area claimed to be the curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passers-by." *State v. Sweet,* 796 S.W.2d 607, 611 (Mo. banc 1990); *see United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987).

We are unable to identify a privacy based reason why this principle should be restricted to the inside of a residence and stop at the residence's threshold to the backyards, or curtilage. If a search warrant specifying only the residence permits the search of 'closets, chests, drawers, and containers' therein where the object searched for might be found, so should it permit the search of similar receptacles located in the outdoor extension of the residence, i.e., the curtilage. To hold otherwise, would be an exercise in pure form over substance.

*Gorman,* 104 F.3d at 275.

Accordingly, in *Gorman, supra,* the 9th Circuit interpreted the provisions of a search warrant that authorized the search of a "bus ... located on the curtilage of the residential property" where the address was set out in the warrant. *Id.* at 273. The *Gorman* court, in reversing the district court's suppression of evidence of a gun found in a jar and partially buried in an area identified by the court as being the curtilage of the bus which had been converted into a residence, found that "[p]lain reading and common sense are the landmarks for the execution and interpretation of the language of a search warrant." *Id.* at 275 (quoting *United States v. Brown,* 822 F.Supp. 750, 754 (M.D.Ga.1993) (citations omitted)). The *Gorman* court then noted that "the Supreme Court has held that a warrant authorizing a search of an area generally authorizes the search of all of that area's subareas even though they are not mentioned in the warrant itself." *Id.* "Thus the search of the curtilage in this case was authorized because it was inseparable for privacy purposes from the bus-residence identified in the warrant." *Id.*

■ In many respects, the facts in *Gorman, supra,* parallel the facts in the instant matter. Here, the search warrant,

*inter alia,* identified the area to be searched as the two vacant trailer homes and a "garage that is converted into a makeshift home." Accordingly, the search warrant implicitly permitted the officers to search the curtilage of either the garage-home or the trailer homes. *See Gorman,* 104 F.3d at 275. No error appears in the trial court's ruling denying Defendant's motion to suppress the evidence found within the garage-home and the curtilage of the garage-home. *State v. Shifkowski,* 57 S.W.3d 309, 319 (Mo.App.2001). Point denied.

The judgment is affirmed.

SHRUM, P.J., and MONTGOMERY, J., concur.