**STATE of Minnesota, Respondent,**

v.

**Raymond Joseph TRAYLOR, Appellant.**

**No. C6–01–244.**

Court of Appeals of Minnesota.

March 26, 2002.

Review Denied May 14, 2002.

Minn. 243, 246, 73 N.W. 161, 162 (1897); *see also Joslyn,* 89 Minn. at 74–75, 93 N.W. at 706.

Mike Hatch, Attorney General, St. Paul; and Amy Klobuchar, Hennepin County Attorney, Elizabeth V. Cutter, Assistant County Attorney, Minneapolis, for respondent.

John M. Stuart, State Public Defender; and Joe Margulies, Special Assistant Public Defender, Margulies & Richman, PLC, Minneapolis, for appellant.

Considered and decided by SCHUMACHER, Presiding Judge, HANSON, Judge, and FOLEY, Judge.

## OPINION

FOLEY, Judge.*

On appeal from his conviction for second-degree assault and a fifth-degree controlled substance offense, appellant argues that the district court erred in admitting testing of deoxyribonucleic acid (DNA) fragments using kits by a manufacturer who has not disclosed methodology and validation studies that would permit peer review of the test results. Appellant also argues that the court abused its discretion by imposing a double upward departure on the assault based on a finding of particular cruelty that was not supported by the record. Lastly, in his pro se supplemental brief, appellant argues that his right to a speedy trial was violated. We affirm.

## FACTS

On November 13, 1999, Debra Clemons reported to the Minneapolis police that she had been stabbed by appellant Raymond Joseph Traylor, and that he was sleeping in her home. The police found Traylor in Clemons's home, arrested him, and recovered a bloody knife and a small amount of cocaine in his pocket. Traylor was charged with one count of second-degree attempted murder, one count of second-degree assault, and one count of a fifth-degree controlled substance offense.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

The state sought to admit DNA evidence obtained through a new DNA testing technique employed by the state that requires a smaller sample size and is much quicker to read than older techniques. The testing involves Polymerase Chain Reaction (PCR) technology, which allows use of smaller sample sizes and examination of fewer, easier to identify, locations on the DNA (known as Short Tandem Repeats (STR)), making this technique quicker to process. To extract DNA material using this technique, technicians use kits supplied by private manufacturers. The manufacturer of the kits used here is PerkinElmer, Inc. (PerkinElmer), and the kits are labeled "Profiler Plus" and "Cofiler."

The district court ruled the DNA evidence obtained through PCR STR testing admissible. At trial, Traylor denied stabbing Clemons and, in fact, denied ever possessing the knife in evidence. The state introduced DNA evidence purporting to establish that blood on the knife and Traylor's pants contained the same DNA as Clemons's blood. The jury convicted Traylor of the assault and drug offenses, and acquitted him of the attempted murder charge. The district court sentenced Traylor to a double durational departure of 102 months and this appeal followed.

## ISSUES

1. Do the guidelines promulgated by the Technical Working Group on DNA Analysis Methods (TWGDAM) continue to apply to the consideration, in Minnesota, of whether the procedures employed in PCR STR testing are reliable?

2. Is the admission of the DNA evidence harmless beyond a reasonable doubt where the DNA evidence has little proba-

---

Minn. Const. art. VI, § 10.

tive value and where substantial other evidence supports the conviction?

3. Did the district court abuse its discretion in imposing an aggravated sentence upon a defendant who, after stabbing the victim, prevented her from seeking medical attention, and continued to physically abuse her?

4. Are a defendant's speedy trial rights violated where most of the excessive delays are attributable either to DNA testing or to the unavailability of defense counsel?

### ANALYSIS

#### I.

■ Traylor's appeal centers on the admission of the PCR STR evidence. Traylor argues that the testing procedures employed by the Minnesota Bureau of Criminal Apprehension (BCA) do not meet the reliability requirements of *State v. Schwartz,* 447 N.W.2d 422 (Minn.1989). In Minnesota, we determine the admissibility of evidence derived from new scientific techniques according to the test derived from *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). *State v. Jobe,* 486 N.W.2d 407, 419 (Minn.1992). The test is two pronged: (1) whether "experts in the field widely share the view that the results [of scientific testing] are scientifically reliable as accurate," and (2) whether the laboratory complied with appropriate standards and controls. *Id.* (quoting *State v. Mack,* 292 N.W.2d 764, 768 (Minn.1980)).

Traylor does not contest that the PCR technique, in the abstract, is generally accepted in the scientific community, but casts his dispute over whether the Profiler Plus and Cofiler test kits, which use STR DNA fragments, are generally accepted in the scientific community. However, the

actual focus of his challenge is whether these test kits produce reliable results and whether the kits have been designed in accordance with accepted guarantees on reliability, questions more appropriately considered under the second prong of the novel scientific evidence test. *See Schwartz,* 447 N.W.2d at 425–26 (considering, despite general acceptance of RFLP DNA analysis, whether testing company's procedures were reliable under second prong of *Frye–Mack* ).

■ Normally, conclusions about whether a technique is generally accepted are reviewed de novo, and findings regarding the foundational reliability of the evidence are reviewed for an abuse of discretion. *Goeb v. Tharaldson,* 615 N.W.2d 800, 815 (Minn.2000). Here, because the question of reliability is not a factual inquiry into whether the particular laboratory made errors, but rather the cold application of a set of guidelines to undisputed facts regarding how a particular commercial product was developed, we also review this question de novo. *Cf. Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 402 (Minn.1996) (application of statute to undisputed facts reviewed de novo).

■ The crux of Traylor's argument is that the PerkinElmer test kits and the usage employed by the BCA are not trustworthy and reliable because they were not developed in accordance with the standards promulgated by the Technical Working Group on DNA Analysis Methods (TWGDAM), a consortium of prominent DNA scientists from the United States and Canada organized by the FBI to establish appropriate standards for FBI laboratories.[1] The state responds by arguing, as the district court concluded, that the

---

1. TWGDAM has since been renamed SWGDAM—"technical" having been replaced with "scientific."

TWGDAM guidelines have been superceded in Minnesota.

Beginning in 1989, the supreme court, in a series of cases, consistently and repeatedly held that the standards promulgated by TWGDAM were the standards that govern determinations of the reliability of a particular testing procedure. *See, e.g., State v. Schneider,* 597 N.W.2d 889, 894 (Minn.1999); *State v. Johnson,* 498 N.W.2d 10, 14 (Minn.1993); *Jobe,* 486 N.W.2d at 420 n. 4; *Schwartz,* 447 N.W.2d at 427–28.

However, in 1994, Congress, through the enactment of the DNA Identification Act of 1994, 42 U.S.C. 14131 (1994), created the DNA advisory board (DAB), which was to be appointed "not later than 180 days after September 13, 1994." 42 U.S.C. § 14131(a)(1)(A). The board was directed to

> develop, and if appropriate, periodically revise, recommended standards for quality assurance, including standards for testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA.

42 U.S.C. § 14131(a)(1)(C). The director of the FBI would then be directed to take the DAB recommendations into account when issuing the actual FBI standards. 42 U.S.C. § 14131(a)(2). Until the director acted upon these recommendations, the TWGDAM guidelines were statutorily deemed to continue as the director's standards. 42 U.S.C. § 14131(a)(4). The DAB guidelines took effect as the "official" FBI standards on October 1, 1998.

The DAB standards differ from the TWGDAM standards in many respects critical to this case—the major distinction being that the TWGDAM standards require that more information about the

methodology be disclosed, and therefore be subjected to peer review and independent validation studies. The PCR STR testing conducted in this case satisfies the DAB standards, but is not based on a process readily available for validation by the scientific community and therefore does not appear to satisfy TWGDAM standards. Accordingly, the admissibility of the DNA evidence depends on whether the DAB standards have superceded the TWGDAM standards in Minnesota. They have not.

The DAB guidelines were approved on July 15, 1998, and took effect on October 1, 1998. Since then, Minnesota courts have reaffirmed the need for compliance with the TWGDAM guidelines. *See, e.g., Schneider,* 597 N.W.2d at 894 (citing *Jobe's* reliance on TWGDAM and stating "the defense offered no evidence of any specific violation of * * * TWGDAM.").[2] Furthermore, much of the specific TWGDAM requirements that are at issue here (not required under the DAB guidelines) have been singled out as important by the supreme court. For example, in *Schwartz,* the supreme court noted:

> The TWGDAM * * * standards stress that publication of a laboratory's work product and data used in DNA analysis, as well as independent replication and validation studies are essential prerequisites to reliability. Efforts to assess the reliability of the commercial laboratories' methodology consequently have been hindered because this information has not yet been made fully available. For example, [the laboratory] has not yet published data regarding its methodology and its probes are only selectively available.

---

**2.** Although the tests in *Schneider* were conducted before the adoption of the DAB guidelines, the guidelines were in effect when *Schneider* was published.

447 N.W.2d at 427–28. We think it is clear that the supreme court has not only chosen the TWGDAM guidelines, but has even approved of guarantees of reliability contained in the TWGDAM guidelines that are absent from the DAB guidelines.

■ This court is an error-correcting court and not a doctrinal court. *St. Aubin v. Burke*, 434 N.W.2d 282, 284 (Minn.App. 1989), *review denied* (Minn. Mar. 29, 1989). As such, we are compelled to follow the standards established by the supreme court. The supreme court has clearly and unequivocally adopted the TWGDAM guidelines and the guarantees of reliability contained therein—not merely whatever guidelines may currently serve as the official standards of the FBI. *See Jobe*, 486 N.W.2d at 419 (noting that supreme court has recognized guidelines as "appropriate for guiding DNA testing"); *Schwartz*, 447 N.W.2d at 427–28 (noting that TWGDAM guidelines stress that methodology is more reliable if subject to scrutiny). Accordingly, absent a contrary conclusion by our state's highest court, the TWGDAM guidelines remain the standard for determining the reliability of DNA evidence.

## II.

■ Although the district court erred by using the DAB guidelines to determine the admissibility of the DNA evidence, we need not consider the appropriateness of the evidence[3] using the TWGDAM guidelines or even remand this case for application of the appropriate guidelines. Here, although the DNA evidence was certainly corroborative, the other evidence is strong, compelling, and more than sufficient to support the conviction.

■ This court will reverse a conviction based on the erroneous admission of objected-to evidence unless the admission was harmless beyond a reasonable doubt. *State v. Shannon*, 583 N.W.2d 579, 585 (Minn.1998). An error is harmless beyond a reasonable doubt "[i]f the verdict actually rendered was surely unattributable to the error." *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996). The court must examine the record as a whole in assessing whether an erroneous admission of evidence was harmless, considering the strength of the state's evidence and the weakness of any defense evidence. *State v. Van Wagner*, 504 N.W.2d 746, 749 (Minn.1993). As a general rule, an error is less likely to be prejudicial where the evidence of guilt is strong. *State v. Dillon*, 532 N.W.2d 558, 558 (Minn.1995).

Here, Clemons identified Traylor as the man who stabbed her and told the police that he could be found sleeping in her home. When the police arrived, they found Traylor asleep in Clemons's bed with blood on his pants. The police also recovered a bloody knife—a weapon that could have inflicted Clemons's wound—from Traylor's possession, and the jury's verdict indicates it did not believe Traylor's story that the knife had been planted into evidence. Finally, this was not a case where a stranger identified the defendant. Clemons and Traylor shared an intimate relationship and Clemons gave a detailed and thorough description of the circumstances surrounding the stabbing. This evidence alone amply supports the verdict. Furthermore, the inculpatory impact of the DNA evidence was minimal. The DNA evidence was only probative toward establishing whose blood was on the knife. But Traylor never disputed that the blood on the knife came from Clemons. In fact, Traylor testified that he never possessed the knife or had even seen the knife before

---

**3.** We note that the nine-page bibliography supplied by the state listing articles on STR DNA evidence played no part in the consideration or decision of this case.

trial. The only way that evidence regarding whose blood was on the knife could have been prejudicial is if there was a significant question as to who had been cut with the knife. There was not. Under such circumstances, any error in the admission of the DNA evidence is harmless. *See State v. Bauer*, 512 N.W.2d 112, 116 (Minn.App.1994) (holding any error made in admission of DNA evidence was harmless where victim knew attacker and gave strong testimony about circumstances of attack), *aff'd* 516 N.W.2d 174 (Minn.1994).

### III.

▆▆▆▆ Traylor argues that there were inadequate grounds to support the double durational departure in his sentence. A district court's sentencing decision will not be disturbed absent a clear abuse of discretion. *State v. Schmit*, 601 N.W.2d 896, 898 (Minn.1999). As noted, the presumptive term of imprisonment was 51 months. The district court imposed the 102–month sentence after finding that there were aggravating circumstances surrounding the commission of the offense. Although the state argues that the district court "stated several factors justifying upward departure,"[4] in fact the court only listed one: that Traylor exhibited particular cruelty in committing the offense. The other factors enumerated by the state were either the individual facts comprising the basis for the court's finding of particular cruelty, or factors that were only mentioned by the district court in contexts other than as justifications for the departure.

▆▆▆▆ Nevertheless, even a single aggravating factor may support a double dura-

tional departure. *State v. O'Brien*, 369 N.W.2d 525, 527 (Minn.1985). A durational departure is justified where the defendant's conduct was significantly more serious than that typically involved in the commission of the charged offense. *State v. Best*, 449 N.W.2d 426, 427 (Minn.1989). Here, after the stabbing, Traylor refused to let Clemons out of her home for several hours so that she could receive medical attention. Furthermore, there was testimony that he disabled the telephones, further hindering her attempts to seek medical attention, and continued to abuse her after the stabbing. In this case, the district court's conclusion that the crime was committed with particular cruelty was supported by the record and was not an abuse of discretion.

### IV.

▆▆▆▆ In his pro se supplemental brief, Traylor argues that his speedy trial rights were violated. Once a defendant makes a demand for a speedy trial, a trial must commence within 60 days after the demand unless good cause is shown. Minn. R.Crim. P. 11.10. This court reviews the record de novo to determine whether the district court used the proper standards for evaluating good cause, *State v. Genung*, 481 N.W.2d 130, 133 (Minn. App.1992), *review denied* (Minn. Apr. 13, 1992), but reviews the determination that there was good cause under an abuse of discretion standard. *State v. Friberg*, 435 N.W.2d 509, 515 (Minn.1989). In reviewing whether the district court abused its discretion in granting a continuance be-

---

**4.** According to the state, the factors considered by the district court were: (1) Traylor's refusal to accept responsibility for his behavior; (2) Traylor's attempt to influence the jury during jury selection; (3) the particular cruelty with which Traylor treated the victim; (4) the fact that Traylor held the victim captive in

her own home for several hours; (5) the particular level of vulnerability due to her level of intoxication; (6) the repeated physical abuse of the victim during her imprisonment; and (7) Traylor's refusal to allow the victim to leave or to seek medical treatment.

yond 60 days, this court considers the reason for the delay, the defendant's assertion of his right to a speedy trial, and the degree of prejudice suffered as a result of the delay. *Id.* at 513.

Traylor demanded a speedy trial on January 20, 2000, and a trial date was set for March 14, 2000. A continuance, which was agreed to by Traylor's attorney, was granted until May 8, 2000, to enable both parties to obtain the DNA report. The trial was then continued from May 8, 2000 to July 17, 2000, due to the unavailability of a critical witness for the state, and Traylor was conditionally released. Finally, Traylor himself requested a continuance from July 17, 2000, because of the unavailability of one of his attorneys. The trial commenced on October 17, 2000.

This handling of Traylor's case was perilously close to a denial of his fundamental right to a speedy trial. The manner in which his case was passed from judge to judge evokes the famous double-play combo of "Tinkers to Evers to Chance," with no one examining the cumulative effect of the numerous continuances granted until a final judge granted Traylor his release pending trial. That said, upon total review, we cannot conclude that the district court abused its discretion, or that Traylor's fundamental rights were violated by the delay. Although we do not approve of the delay, we note, importantly, that the delay was, initially, so that DNA evidence could be processed—usually a valid reason for delay. *See State v. Stroud,* 459 N.W.2d 332, 335 (Minn.App.1990) (noting that DNA evidence can both inculpate and exculpate and may be valid reason for delay). Although the DNA evidence was of little utility to the state, we cannot say that the decision to grant the continuance was in error. At a minimum, given Traylor's story, the DNA evidence at least had the potential to be exculpatory, if not in-

culpatory. Three months of the additional delay is directly attributable to the unavailability of one of Traylor's attorneys. Finally, we note that the harshest effects of the delay were mitigated by the fact that Traylor was on conditional release during much of the delay.

## DECISION

Although the admission of DNA evidence without compliance with the TWGDAM guidelines was error, the error was harmless because the DNA evidence had little inculpatory effect, and substantial additional evidence of guilt was present. Furthermore, the district court did not abuse its discretion in imposing a double durational departure in sentencing Traylor. Lastly, Traylor's speedy trial rights were not violated by continuances granted to obtain the DNA testing and due to defense counsel's unavailability.

Affirmed.