**STATE of Missouri, Respondent,**

v.

**Glenn E. FAULKNER, Appellant.**

**No. 24851.**

Missouri Court of Appeals,
Southern District,
Division One.

March 27, 2003.

Motion for Rehearing or Transfer Denied
April 18, 2003.

Application for Transfer Denied
May 27, 2003.

Emmett D. Queener, Assistant State Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Andrea Mazza Follett, Assistant Attorney General, Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Glenn E. Faulkner ("Appellant") appeals his conviction and sentence, after a jury trial, of forcible rape, § 566.030; forcible sodomy, § 566.060; kidnapping, § 565.110; and armed criminal action, § 571.015.[1] The Circuit Court of Jasper County imposed consecutive terms of life imprisonment for forcible rape, life imprisonment for forcible sodomy, fifteen years for kidnapping, and thirty years for armed criminal action. Appellant raises five points of trial court error, discussed below. We affirm.

"The evidence is restated below in the light most favorable to the trial court's judgment, including all reasonable inferences tending to support that judgment and ignoring all contrary inferences." *State v. Shaw*, 847 S.W.2d 768, 771 (Mo. banc 1993).

Viewed from this perspective, the evidence shows that on October 31, 2000, fourteen-year-old C.P. ("Victim") left her home in Joplin at approximately 7:20 a.m. to go to a friend's house with whom she was to walk to school.[2] As she was walking, she saw a van drive by. Victim noticed the van when it came back and pulled in front of her. A man wearing a camouflaged hunting mask got out of the van holding a gun. The man opened the sliding door on the driver's side of the van while keeping the gun pointed at Victim. He grabbed Victim's backpack and told her to get into the van. Victim at first thought this was a Halloween prank, but when the man cocked the pistol, she believed that she was in danger.

The man put the gun to Victim's head and threatened to shoot her if she did not get into the van. He threw her backpack into the van, pushed her inside, and told her to lie down and not to look up. Victim asked the man if she would ever see her mother again, and the man replied she would if she did what he said. The man got into the van, closed the door, and began to drive.

When the van stopped, Victim heard the man rummaging in the glove box. The man got out of the van and opened the door. He then told Victim to sit up and keep her eyes closed, which she did. While her eyes were closed, the man began to touch Victim's breasts through her clothing. The man then forced Victim to get on her knees and perform oral sex on him. Afterwards, the man made Victim get back onto the seat, put a camouflage mask over her head, and resumed fondling her breasts. A few minutes later, the man took the camouflage mask off of Victim and told her to keep her eyes closed. He proceeded to remove Victim's shirt and place it over her face so she could not see.

After fondling her breasts again, the man removed Victim's pants and underwear, and began to move the gun in and out of her vagina several times. Victim was crying and screaming during this time, but the man told her to shut up. Victim next heard the sound of metal on metal and thought he had placed the gun on the roof of the van. The man then pulled Victim closer to him and forced her to have sexual intercourse with him.

---

1. All statutory references are to RSMo 2000, unless otherwise specified.

2. Because C.P. is a minor, we refer to her by her initials or as "Victim" to protect her privacy.

Although Victim did not know how long it lasted, at some point the man stopped having intercourse with her, threw some of her clothes at her, and told her to get dressed. As she dressed, Victim could not find her underwear, and the man said he had thrown them out. The man told her to get out of the van and returned her backpack. He pointed off into the distance and told Victim to start walking toward a house located in that direction. He then told Victim not to look back or he would shoot her. At no time during the rape did Victim see the man's face or any facial feature.

On the morning of the assault, Belinda Elliston was traveling north on County Road 303 in Carl Junction at approximately 8:00 a.m. taking her children to school. Ms. Elliston saw a bluish-green van driving on an unpaved lane on her property. She paid attention to the van because her family had had problems with trespassers on their property in the past. The van turned south onto 303 and passed Ms. Elliston as she was headed northbound, nearly clipping the front corner of her car and causing her to swerve to miss it. As the van passed, Ms. Elliston saw the driver's face. The following day Ms. Elliston assisted the police in preparing a computer generated composite of the man. Ms. Elliston later identified Appellant as the driver of the van from a photographic lineup. At trial, Ms. Elliston identified Appellant as the driver of the van.

Meanwhile, Linda DeGraff was driving on Gum Road in Carl Junction toward her daughter's house sometime between 8:00 and 8:30 a.m. when she saw Victim walking along the road. Ms. DeGraff stopped to check on Victim because she saw the girl was crying. Victim told Ms. DeGraff that she had been kidnapped and raped, and that she didn't know where she was. Ms. DeGraff took Victim to her daughter's

house where they called the police. Victim was taken by ambulance to the Children's Center.

Once at the hospital, a pediatric nurse practitioner performed a sexual abuse forensic examination on Victim. The nurse found dried secretions in Victim's pubic hair and secretions in her vagina. Suspecting that semen was present in Victim's vaginal area, the nurse took samples of the vaginal secretions with a "rape kit" and gave the evidence she collected to Detective Darren Gallup of the Joplin Police Department. The detective delivered the rape kit to the Missouri Southern State College Crime Laboratory (Missouri Crime Lab).

On the afternoon of the crime, Jasper County sheriff's deputies found a pair of girl's underwear in the area of Carl Junction where Victim had been raped, which Victim later identified at trial as the underwear she was wearing when she was abducted.

On November 15, 2000, approximately two weeks after the rape, Detective Bill Hawkins took Victim to various car lots and parking lots to see if she could point out a van similar to the one her abductor drove. Victim had described the van as an aquamarine or topaz blue color with sliding doors and a light-colored interior. She further described the second and third row of seats as being bench style with no headrests. When Victim spotted a van in a parking lot that resembled the one used in her abduction, the detective photographed it.

In the course of investigation, some tire tracks were found near the rape scene. These tire tracks were photographed, and plaster casts were made of portions of them. Goodyear Conquest tires were the only ones the director of the crime lab could come up with that matched the pattern and the letter "T" seen in the impres-

sion of a sidewall of one tire. Further investigation revealed that Goodyear Conquest tires were placed on all Chrysler, Dodge, and Plymouth minivans from 1996 to 2000.

At some point during the investigation, an anonymous caller contacted the Carthage police department. In that phone call, the caller described Appellant and reported that Appellant worked at H.E. Williams. The caller further identified the van Appellant drove.

On November 16, 2000, the day after Victim had spotted a van similar to that of her assailant's, Officer Hawkins and Corporal Roger Renken of the Missouri Highway Patrol went to the H.E. Williams parking lot where they saw Appellant's 1997 Plymouth van, which matched the description Victim had given them as well as that of the anonymous caller. Appellant's van had Goodyear Conquest tires on it. The officers ran the license plate numbers from the van and discovered the plate was registered to Appellant, but for a Pontiac car instead of the van. Furthermore, the license check revealed that Appellant's driver's license was suspended.

The officers contacted an employee in the personnel department where Appellant worked and learned that Appellant had not been at work on October 30 or October 31, 2000, the day Victim was raped. Appellant was not scheduled to have either day off from work, and he did not arrange in advance to be gone. The officers returned to their car and waited for Appellant.

When Appellant approached the van, the officers identified themselves and told him they were investigating a kidnapping and rape. The officers also told Appellant that he and his van matched the suspect's description. At some point the officers also confronted Appellant with the improper

registration on the van and the suspension of his driver's license. Although Detective Hawkins did not recall if he told Appellant that he could go to jail for those offenses, he did tell Appellant that he could get a "ticket" for them.

After Detective Hawkins informed Appellant of the investigation, he asked Appellant if he would follow them to the police station. The officers asked Appellant to give a statement as to his whereabouts on October 31, 2000. Appellant was not under arrest and was not advised of his *Miranda*[3] rights at that time. Appellant drove his own vehicle to the police station.

At the police station, Detective Hawkins asked Appellant to provide a DNA sample. He told Appellant that a DNA sample could possibly eliminate him as a suspect in the investigation, or it might make him a suspect if there was a DNA match. Appellant was informed that he could refuse to give a DNA sample. Detective Hawkins claims he did not tell Appellant that he would be arrested if he refused to give the DNA sample. However, at some point during the interview, Detective Hawkins told Appellant that he could be arrested and jailed on the improper van license and suspended driver's license. Appellant agreed to provide a DNA sample and signed a consent form.

Detective Hawkins provided Appellant with prepackaged buccal swabs which Appellant opened and used to swab the inside of his cheeks. After Appellant had completed this task, the detective took the swabs and placed them in an evidence locker where they were allowed to air-dry overnight before being sent to the Missouri Crime Lab. Appellant was free to leave after he gave the DNA samples.

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The following day, Appellant was interviewed at the Joplin police station. Although Detective Hawkins advised Appellant of his *Miranda* rights before this interview, he was not arrested that day either, and he was once again allowed to leave after the interview.

On December 4, 2000, officers executed a search warrant at Appellant's home and seized two .380 caliber bullets found in a utility room, although the officers did not find a gun. Witness John Durbin testified at trial that sometime between Halloween and the middle of November 2000, he purchased a .380 caliber handgun from Appellant.

Appellant was arrested on December 4, 2000. Upon his arrest, Detective Gallup seized and photographed the clothing he was wearing, which were later shown to Victim at trial. When Detective Gallup later showed the photo of the T-shirt to Victim, she identified it as the shirt the rapist was wearing on October 31, 2000.

Appellant moved to suppress the DNA evidence obtained by the officers on November 16, 2000. At the suppression hearing, Appellant testified the only reason he cooperated with the police in the investigation was because they had told him he could go to jail for the improper registration and suspended license. He further stated that he thought if he cooperated, the police would not pursue the registration and license problems. Appellant told the court that he provided the DNA samples only because he felt threatened with being put in jail if he did not cooperate. Although Appellant admitted that he did not think he was under arrest at that time, he did not think he was free to leave. Moreover, Appellant stated that because he felt threatened, he did not willingly waive his right to remain silent or his right to an attorney.

The trial court overruled Appellant's motion to suppress the evidence, concluding that he had voluntarily consented to provide the DNA sample. The trial court further found that Appellant was not in custody, evidenced by the fact that he was allowed to leave after providing the DNA sample, and therefore the *Miranda* warnings were not required. During trial, Appellant renewed his objection to this evidence, which was again overruled.

Appellant filed a motion prior to trial to exclude the DNA evidence. Appellant further requested a hearing in accordance with *Frye v. United States*, 293 F. 1013 (D.C.Dist.1923) to determine: (1) the admissibility of DNA matching that used the Profiler Plus and COfiler Short Tandem Repeat (STR) DNA testing kits; and (2) the efficacy of the population frequency statistics used to compare results.

The trial court granted a *Frye* hearing on the admissibility of the STR testing method. However, the trial court denied the hearing on the issue of population frequency statistics because the calculation used, the "product rule,"[4] had been accepted by the Missouri Supreme Court in *State v. Kinder*, 942 S.W.2d 313 (Mo. banc 1996), *cert. denied*, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). At the *Frye* hearing, both the State and Appellant presented expert testimony as to the STR method of DNA testing. The trial court ruled that the DNA evidence was admissible, and it was presented at trial. Appellant renewed his objections at trial, which were again overruled.

Several witnesses were presented at trial. The State called Michelle Heincker of the Missouri Crime Lab as a witness. Ms. Heincker, in analyzing the rape kit pre-

---

4. See discussion under Appellant's Point Three, relating to the product rule.

pared from the examination of Victim, detected semen in the vaginal swabs and intact sperm in the vaginal smear. Further examination revealed that Appellant's DNA from the buccal swabs he provided at the police station was consistent with the DNA profile found in the vaginal swabs. Utilizing the product rule, Ms. Heincker then prepared a statistical analysis using data supplied by the FBI. Ms. Heincker testified that statistical analysis revealed "one person out of every 1.997 times 10 to the 20th people in the population" could provide such a match.[5]

■ At trial, Appellant submitted the videotaped testimony of Dr. Laurence Mueller, teacher of ecology and evolutionary biology at the University of California at Irvine, whose research includes population genetics applied to DNA typing. Although Dr. Mueller acknowledged that the FBI and most forensic laboratories use the product rule to make their calculations, he testified that he was concerned by the use of the product rule in DNA typing. As related by Dr. Mueller, because of his concerns with the product rule, he applied an alternative method of calculating a genetic match, known as the "counting method" utilizing FBI databases, and came up with a different result than the one reached by Ms. Heincker. Dr. Mueller ascertained that over 3900 people had profiles for the specified 13 loci.[6] However, he found no matching profile for the sperm fraction of the samples collected in Appellant's case. Dr. Mueller determined that the frequency of a random match would be one in less than 1300.

The record also shows that Marissa Wyrick, Appellant's former girlfriend, was the person to whom Appellant's van was actually titled. Although Appellant did not show up for work on October 31, 2000, Ms. Wyrick testified at trial that Appellant left his children with her at approximately 4:15 a.m. on the day of the rape and told her he was going to work.

The jury found Appellant guilty on all four counts, and Appellant was sentenced in accordance with the jury's recommendation. This appeal follows.

In his first point on appeal, Appellant assigns error to the trial court in its denial of his motion to suppress the buccal swabs and evidence derived from them, and in overruling objections to the evidence at trial, because Appellant's consent was not freely and voluntarily given. Appellant contends that his Fourth Amendment right to be free from unreasonable search and seizure was violated because his consent was the result of threats that he could be arrested and jailed on traffic offenses and those threats caused him to believe he could avoid immediate incarceration only by cooperating with the officers.

"Review of the trial court's denial of Defendant's motion to suppress is based upon the whole record and the totality of the circumstances surrounding its decision and we will affirm the ruling if it is supported by substantial evidence." *State v. Potter*, 72 S.W.3d 307, 313 (Mo.App.2002); *see State v. Middleton*, 43 S.W.3d 881, 884 (Mo.App.2001). " 'The trial court determines the weight of the evidence and the credibility of witnesses, and we will not

---

**5.** The statistical analysis was described by Dr. Laurence Mueller as, "1 in 1.9972 × 10 + 20. That basically means I have a number with 20 zeros, essentially, after it."

**6.** Loci are the specific locations on the DNA chain that are tested to determine a match.

"Loci containing STRs are scattered throughout the chromosomes in enormous numbers." *State v. Butterfield*, 27 P.3d 1133, 1137 n. 2 (Utah 2001). "Such loci have a fairly large number of alleles and are usually capable of unique identification." *Id.*

substitute our discretion for that of the trial court in deciding whether sufficient evidence supporting the trial court's ruling exists.'" *Potter,* 72 S.W.3d at 313 (quoting *State v. Metz,* 43 S.W.3d 374, 381 (Mo.App. 2001)). " 'Although we review the facts under a clearly erroneous standard, the issue of whether the Fourth Amendment has been violated is a question of law which we review *de novo.*'" *Id.* (quoting *Middleton,* 43 S.W.3d at 884).

 Extractions of bodily fluids implicate the principles applicable to searches and seizures. *See State v. Ikerman,* 698 S.W.2d 902, 906 (Mo.App.1985); *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). "Generally, searches conducted without a valid search warrant are unreasonable and violate Fourth Amendment principles." *State v. Sullivan,* 49 S.W.3d 800, 813 (Mo. App.2001). One of the exceptions to this general rule is a search conducted pursuant to a valid consent. *Id.* " 'Consent is freely and voluntarily given if, considering the totality of all the surrounding circumstances, ... the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so.'" *Id.* (quoting *State v. Hyland,* 840 S.W.2d 219, 221 (Mo. banc 1992)). "The State bears the burden of proving that the consent to search is freely and voluntarily given." *Sullivan,* 49 S.W.3d at 813.

 " '[A] court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *State v. Solt,*

48 S.W.3d 677, 680–81 (Mo.App.2001) (quoting *Florida v. Bostick,* 501 U.S. 429, 439–40, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

 Appellant asserts two grounds for claiming his consent was not voluntary: (1) his agreement to follow the officers to the police station was not consensual; and (2) his agreement to provide the DNA sample was not consensual.

 "In *U.S. v. Espinosa,* 782 F.2d 888, 890–891 (10th Cir.1986), the court identified three categories of police/citizen encounters." *State v. Childress,* 828 S.W.2d 935, 945 (Mo.App.1992). These are: (1) an arrest which requires probable cause; (2) an investigative detention which requires only reasonable suspicion based on specific and articulable facts; and (3) a "consensual police/citizen encounter, characterized by voluntary cooperation of a citizen in response to non-coercive questioning." *Id.* Consensual communications between an officer and a citizen involving no coercion or restraint of liberty do not constitute seizures,[7] and thus do not invoke Fourth Amendment protection. *Id.* However, "[a] police-citizen encounter which is consensual in its inception may lose that characteristic later if the officers, by means of physical force or show of authority, in some way convey the message that compliance with their requests is required, in which event a seizure occurs triggering Fourth Amendment scrutiny." *State v. Talbert,* 873 S.W.2d 321, 324 (Mo.App. 1994).

Review of the record reveals that Appellant's encounter with the police in the parking lot was consensual. The officers

---

7. "[A] seizure may occur where there is 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Solt,* 48 S.W.3d at 681 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

approached Appellant, briefly discussed the investigation with him, told Appellant they were aware of his registration violation and license suspension, and asked if he would accompany them to the police department to give a statement about where he was on the day of the rape. There was no evidence that the officers used physical force or a forceful show of authority to convey that Appellant had to accompany them to the police station. In fact, Appellant drove his own vehicle to the police station.

Appellant claims he "got the message" that his compliance with their request was necessary to avoid immediate incarceration on unrelated matters, but he does not provide evidence as to how that message was communicated to him. The only evidence to support Appellant's claim was that he thought if he cooperated with the police, he would not go to jail for the vehicle violations. Detective Hawkins admitted telling Appellant that he could be jailed for the vehicle violations. However, Detective Hawkins testified at the suppression hearing that he did not tell Appellant he would be arrested if he did not follow the officers to the police station. "Deference is given to the trial court's superior opportunity to assess the credibility of the witness and weigh the evidence." *State v. Fuente*, 871 S.W.2d 438, 441 (Mo. banc 1994). The trial court did not find Appellant's testimony, that he felt threatened, to be credible. Accordingly, we assign no error to the trial court.

Our review of the record reveals that Appellant voluntarily consented to provide the DNA sample. Detective Hawkins testified that on the day Appellant followed the officers to the police station, they met with him in a conference room. The detective further testified that he and Corporal Renken were the only ones who spoke with Appellant that day. Appellant was not in custody at that time and was, in fact, allowed to leave after the meeting. There was no evidence that the officers displayed their weapons or touched Appellant in an effort to compel his consent. In fact, there was no testimony from Appellant that the officers used threats of harm or a threatening tone of voice to indicate that he was required to provide a DNA sample. Appellant's only argument is that the officers, by requesting Appellant to provide a DNA sample, instigated a situation which communicated to Appellant that his cooperation was necessary in order to avoid incarceration on the license and registration violations.

Since there was no evidence that the consensual encounter had turned into a seizure of Appellant's person, this Court cannot say the trial court clearly erred in denying Appellant's motion to suppress the evidence or in overruling his objections at trial. There was substantial evidence to show that Appellant was not in custody when he followed the officers to the police station, and once at the police station, Appellant was free to leave at any time. He may have consented in the hopes of avoiding incarceration on the license and registration violations, but there is no evidence that the officers compelled his cooperation by threatening him with jail. Point denied.

■■■■ In Appellant's second point, his claim of trial court error is two-fold. First, Appellant avers the trial court erred in admitting DNA evidence utilizing the STR method of DNA typing because the State failed to establish that the STR typing method was generally accepted within the applicable scientific community, namely the fields of molecular and biological science. Second, Appellant asserts that

evidence revealed "the primers [8] contained in the Profiler Plus and COfiler kits have not been released to the scientific community for peer review and verification of the validity of the method to produce correct results" and thus are not generally accepted in the scientific community.

"DNA typing methods are designed to extract portions of DNA molecules and determine whether the genetic profile resulting from a forensic sample matches that of a suspect." *State v. Gore,* 143 Wash.2d 288, 21 P.3d 262, 270 (2001). State's witness, Robin Rothove, of the Missouri Highway Patrol Crime Laboratory testified at the *Frye* hearing that the first method developed to analyze DNA evidence was restriction fragment length polymorphism (RFLP). In *State v. Davis,* 814 S.W.2d 593, 602–03 (Mo. banc 1991), the Missouri Supreme Court found the RFLP method was generally accepted in the scientific community. *Kinder,* 942 S.W.2d at 326. However, in the case at bar, Appellant challenges the more recent PCR/STR method of DNA typing.[9]

Pursuant to Appellant's motion to exclude the DNA evidence, the court conducted a *Frye* hearing prior to trial. The State called Robin Rothove and Dr. Philip R. Whittle of the Missouri Crime Lab to testify to the general scientific acceptance in the scientific community of the STR method of DNA typing. Appellant called Dr. Donald E. Riley, a research associate professor at the University of Washington and a research biochemist for the VA Medical Center in Seattle, Washington. Dr. Riley testified at the *Frye* hearing that the STR method of DNA typing was not generally accepted in the scientific community.

■■■ In determining the admissibility of scientific evidence, Missouri follows the *Frye* standard. *State v. Salmon,* 89 S.W.3d 540, 543 (Mo.App.2002). " 'The long accepted standard for admissibility of results of scientific procedures enunciated in *Frye v. United States,* requires that such may be admitted only if the procedure is sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Id.* (quoting *State v. Davis,* 814 S.W.2d 593, 600 (Mo. banc 1991)). The trial court in *Salmon* found the PCR STR method to be generally accepted in the scientific community. *Salmon,* 89 S.W.3d at 545.[10]

Appellant does not contest that the STR method *itself* is generally accepted in the scientific community, but asserts the trial court incorrectly identified the *applicable* community. In ruling that the DNA evi-

---

**8.** A description of what constitutes a "primer" is discussed at pages 19–20.

**9.** Polymerase chain reaction ("PCR") is a process by which DNA fragments too small to be suitable for RFLP analysis can be analyzed. Under the PCR process, these DNA fragments are duplicated many times, thus allowing very small samples to be accurately tested. PCR also permits testing in a relatively short time in comparison to prior methods that required the decay of radioactive materials. Finally, unlike RFLP testing, which destroys the sample, PCR processing allows a technician to reproduce and verify test results by creating a larger sample for testing.

Another form of PCR testing involves the use of locations on the DNA strand containing short tandem repeats ("STR") of baseline patterns. STR testing reveals length differences between chromosomes on different people with the same base pair sequences. There are thirteen locations at which the number of STRs are known to vary from person to person. Thus, if all thirteen locations of the known and questioned sample are identical, a match is considered to have been made. *People v. Shreck,* 22 P.3d 68, 71 (Colo.2001).

**10.** Missouri courts have accepted the PCR technique of DNA testing. *See State v. Brown,* 949 S.W.2d 639, 641 (Mo.App.1997); *State v. Hoff,* 904 S.W.2d 56, 59 (Mo.App.1995).

dence was admissible, the trial court stated the scientific community which should be considered in determining general acceptance of the DNA typing was forensic science. Appellant cites *Davis* for the proposition that DNA typing belongs to the molecular biology and chemistry fields of science. A close reading of *Davis*, however, reveals that there is no mention of the molecular biology or chemistry fields of science. In explaining the process of DNA fingerprinting, the *Davis* court set out that "[t]he DNA is chemically extracted from the blood sample and purified to obtain a high molecular DNA." *Davis*, 814 S.W.2d at 598. The term "molecule" is used only in reference to the process by which DNA fingerprinting is conducted. *See id.* Moreover, in *Davis* our state supreme court upheld the trial court's finding that DNA fingerprinting had gained general acceptance within the scientific community without identifying the field of science as molecular biology or chemistry. *Davis*, 814 S.W.2d at 602–03. Contrary to his argument on appeal, Appellant presented no evidence at the *Frye* hearing that molecular biology or chemistry is the applicable field of science. We find this part of Appellant's argument to be without merit.

■■■ In this same point, Appellant next claims that because the primers contained in the Profiler Plus and COfiler kits have not been released to the scientific community for peer review and verification, the kits have not been generally accepted in the scientific community.

According to expert testimony elicited at trial, in order to extract DNA material from a cell, scientists use kits purchased from private manufacturers. The record shows that the manufacturer of the Profiler Plus and COfiler kits used in this case

is Applied Biosystems. The Profiler Plus and COfiler kits contain DNA primers. Ms. Rothove testified at the *Frye* hearing that a primer is a sequence of nucleotides, which is a component of DNA, that determines where a DNA molecule is to be copied. Dr. Riley testified that the DNA primers contained in the kit are very important because they define what part of the DNA molecule will be copied, and they tell the enzymes in the kit where to begin and end.

As previously set out, Appellant submits that because the primers contained in the Profiler Plus and COfiler kits have not been released for peer review or verification, they have not been generally accepted in the scientific community. Defense expert, Dr. Riley, testified at the *Frye* hearing that the Technical Working Group on DNA Analysis Methods (TWGDAM) recommended that information on DNA testing kits be made available to the scientific community for review to determine the validity of the kits.[11]

In support of his argument, Appellant relies on *State v. Traylor*, 641 N.W.2d 335 (Minn.App.2002), where a Minnesota appellate court concluded that the trial court erred in its ruling on the admissibility of the DNA evidence. *Traylor*, 641 N.W.2d at 341. However, Appellant fails to recognize that although Minnesota's test is based on the *Frye* standard, its test has two prongs: (1) "whether 'experts in the field widely share the view that the results of scientific testing are scientifically reliable and accurate,'" *Traylor*, 641 N.W.2d at 339 (quoting *Frye*, 293 F. at 1014), and (2) "whether the laboratory complied with appropriate standards and controls." *Id.* Missouri courts do not require proof of

---

**11.** TWGDAM was a group led by the FBI, whose mission was to set up guidelines for forensic laboratories. *See Traylor*, 641 N.W.2d at 339. The group's name was later changed to Scientific Working Group on DNA Analysis Methods (SWGDAM). *Id.*

laboratory compliance with standards and controls. *See Salmon,* 89 S.W.3d at 543. Therefore, since Minnesota applies a different standard to determine admissibility, *Traylor* is inapplicable to the case at bar. *See Salmon,* 89 S.W.3d at 543.

In our review of the evidence, we determine that the test kits at issue did not involve new scientific techniques. The concerns relating to the reliability of the results produced by the test kits did not implicate the reliability or general scientific acceptance of the principles on which the STR test itself is based. It is conceded by Appellant's expert that use of the Profiler Plus and COfiler kits is widespread in the testing community. The record shows that the Missouri Crime Lab began utilizing the ABI 310 capillary electrophoresis unit using the Profiler Plus and COfiler kits in conducting DNA testing in late 1999 or early 2000.

Although Appellant's expert, Dr. Riley, opined that the kits had not been subjected to the scientific scrutiny, he acknowledged that most forensic labs use them. He also agreed that other experts in the field were of the opinion that STR typing utilizing the Profiler and COfiler kits is generally accepted in the scientific community. In fact, on cross-examination, Dr. Riley conceded that with proper controls and with well-defined systems, the Profiler Plus and COfiler testing kits could provide valid results acceptable in the scientific community. This portion of Appellant's argument is also without merit. Point denied.

In his third point, Appellant claims the trial court erred when it denied his request for a *Frye* hearing on the application of the "product rule" method of calculating a genetic match under the STR method of DNA typing. Appellant argues that the trial court's conclusion that the use of the product rule was acceptable under *Kinder*

failed to consider that the STR method is different from the method used in *Kinder.* Thus, Appellant contends, the holding in *Kinder* fails to establish general acceptance in the scientific community that the product rule accurately calculates the match frequency under the new STR methodology.

"The product rule is one technique used to determine the probability of finding a match between a DNA sample from a suspect and DNA material found in a body fluid sample recovered from a crime scene." *State v. Jackson,* 255 Neb. 68, 582 N.W.2d 317, 322 (1998). The statistical evidence is offered to help the jury evaluate the significance of the finding that a sample of DNA obtained from a victim matches the DNA profile of the defendant. *See Kinder,* 942 S.W.2d at 326. This Court must now determine whether utilizing the product rule method of calculating a genetic match under the STR method of DNA typing is novel, such that a *Frye* hearing should have been conducted to determine whether the product rule method has gained general acceptance within the relevant scientific community.

The issue in *Kinder* was, "the reliability of the statistical means that are used to attach a numerical significance to a genetic match between two samples." *Id.* at 327. Our state's highest court held "the product rule is generally accepted in the scientific community, and that population frequency statistics based on the product rule are admissible." *Id.*

The crux of Appellant's argument is that *Kinder* is inapplicable to the case at bar because *Kinder* involved the RFLP method of DNA analysis, while the STR method was utilized in Appellant's case. In essence, Appellant is challenging the reliability of the product rule as it relates to STR typing. Appellant's argu-

ment, however, fails since our high court made clear that "[a]ny criticism of the reliability of the product rule or of the particular methods used to apply the product rule pertains only to the weight to be given the DNA evidence by the jury." *Id.* at 327. Moreover, "[w]here a defendant has objected to 'the manner in which the analysis was conducted' or to 'the specific test results,' such objection 'goes to the weight and not the admissibility of the evidence.' " *State v. Huchting,* 927 S.W.2d 411, 418 (Mo.App.1996) (quoting *State v. Moore,* 690 S.W.2d 453, 456 (Mo.App. 1985)). Accordingly, the criticism raised by Appellant of the DNA test's reliability did not prevent the admissibility of the results of the test, but went to the weight of the evidence, which was for the jury to determine. *Huchting,* 927 S.W.2d at 418. Appellant's request for a *Frye* hearing was properly denied by the trial court. Point denied.

In his fourth point, Appellant asseverates the trial court abused its discretion in overruling Appellant's objections to the cross-examination of his expert, Dr. Mueller. During cross-examination, the State questioned Dr. Mueller as to whether the probative value of a statistical DNA "match" differed based on the amount of other evidence demonstrating guilt. Appellant posits the testimony of his expert witness elicited by the State invaded the province of the jury on the ultimate issues of whether Appellant kidnapped, raped and sodomized Victim.

At trial, Appellant presented the videotaped deposition of Dr. Mueller. On direct examination, Dr. Mueller opined that the Missouri Crime Lab had miscalculated the DNA findings and expressed the concerns he had with using the product rule with STR typing. Dr. Mueller expressed his preference for an alternative to the product rule method known as the "counting method," although he admitted this was a minority view.

The State cross-examined Dr. Mueller during his deposition about an article he had written entitled *The Use of DNA Typing and Forensic Science.* Under cross-examination, Dr. Mueller agreed that in the article he discussed whether the statistical significance of a DNA match "should also be related to whether there is other evidence of the defendant's guilt." The State asked Dr. Mueller, "[s]o, the number that you have reached under the counting method of one in 1300 might be statistically significant enough to convict this defendant if there is other evidence which collaborates his guilt?" Dr. Mueller answered, "I think that's possible." Appellant objected to this line of questioning as invading the province of the jury, but his objections were overruled by the trial court.

The trial court has broad discretion to admit or exclude evidence at trial, and an appellate court will reverse only upon a showing of a clear abuse of discretion. *State v. Simmons,* 944 S.W.2d 165, 178 (Mo. banc 1997), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). A trial court will be found to have abused its discretion when a ruling is " 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration....' " *State v. Brown,* 939 S.W.2d 882, 883–84 (Mo. banc 1997) (quoting *Shirrell v. Missouri Edison Co.,* 535 S.W.2d 446, 448 (Mo. banc 1976)). The trial court's action cannot be considered an abuse of discretion if reasonable persons could differ about the propriety of those actions. *Brown,* 939 S.W.2d at 883.

 " 'Generally, expert testimony is admissible if it is clear that the subject of such testimony is one upon which the

jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence.'" *State v. Clements,* 849 S.W.2d 640, 644 (Mo.App.1993) (quoting *State v. Lawhorn,* 762 S.W.2d 820, 822 (Mo. banc 1988)). "An expert may testify as to his opinion on an ultimate issue in a criminal case, but the evidence must aid the jury and it must not invade the province of the jury." *Clements,* 849 S.W.2d at 644. "Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion." *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997); *State v. Taylor,* 745 S.W.2d 173, 175 (Mo.App.1987).

■ Dr. Mueller's testimony did not invade the province of the jury on the ultimate issue of whether Appellant kidnapped, raped and sodomized Victim. The cross-examination testimony of Dr. Mueller simply reflected his view that DNA calculations, combined with other physical evidence, could provide evidentiary support to convict a defendant. His testimony as an expert in the field of population genetics aided the jurors in understanding the possible correlation between DNA evidence and other types of physical evidence. Although there is a danger that jurors might be over-awed by the evidence presented by expert witnesses or might defer too quickly to the expert's opinion, *State v. Williams,* 858 S.W.2d 796, 800 (Mo.App. 1993), the jury in the case at bar was not compelled by Dr. Mueller's testimony to believe that Appellant had committed the offenses as charged. The jury was free to give Dr. Mueller's testimony the weight they thought it deserved and to draw the inferences they believed should be drawn from the evidence presented. *See State v. Swarens,* 294 Mo. 139, 241 S.W. 934, 939–40 (banc 1922). Point denied.

■ In his fifth point, Appellant posits the trial court plainly erred in failing to correct, *sua sponte,* the State's closing argument that the composite drawing prepared by Belinda Elliston was accurate enough to permit the anonymous caller to identify Appellant from the composite since there was no evidence submitted at trial that the anonymous caller did in fact identify Appellant from the composite drawing. Appellant contends that the trial court's error will result in manifest injustice if left uncorrected because the identification of the perpetrator was the only contested issue at trial. Moreover, Appellant maintains that the State's unsupported argument improperly bolstered Ms. Elliston's identification of Appellant as the man she saw at the scene of the crime.

At trial, State's witness Belinda Elliston testified that she saw Appellant driving a bluish-green van out of her field on the morning of the rape. Ms. Elliston's testimony was the only direct evidence placing Appellant near the scene of the crime. She further testified that the day after the crime she helped police create a computer-generated composite of the driver by selecting different features from options available on the computer. Ms. Elliston later identified Appellant as the driver of the van from a photographic lineup.

In his closing argument, defense counsel challenged Ms. Elliston's identification of Appellant, claiming that she could only have had moments to actually look at the driver's face while she was taking evasive actions to avoid being struck by the van as it passed. Defense counsel also pointed out that the photograph of Appellant that Ms. Elliston had picked out of the lineup did not look like the man she helped develop in the composite picture.

In the State's closing argument, the prosecutor defended Ms. Elliston's identification of Appellant by arguing that her

composite drawing was good enough to lead to Appellant's arrest. The prosecutor further argued that the composite led to the anonymous caller identifying the Appellant. According to the State's argument, the anonymous caller said "there's a guy that looks like the composite that drives a van that matches the description given by the victim." Appellant failed to object to any portion of the State's closing argument. Accordingly, this Court is limited to plain error review under Rule 30.20.[12] *State v. Mathews,* 33 S.W.3d 658, 662 (Mo.App.2000).

Appellant bears the burden of showing that an alleged error rises to the level of plain error. *State v. Kalagian,* 833 S.W.2d 431, 434 (Mo.App.1992). "This burden is greater than mere prejudicial error, requiring a showing that a manifest injustice or a miscarriage of justice will inexorably result if left uncorrected." *Id.; Mathews,* 33 S.W.3d at 662.

" 'Plain error will seldom be found in unobjected closing argument.' " *State v. Vaughn,* 32 S.W.3d 798, 800 (Mo. App.2000) (quoting *State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992)). "This is because 'alleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury.' " *Vaughn,* 32 S.W.3d at 800 (quoting *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc 1988)). The appellate court will grant relief only if there is a reasonable probability that, in the absence of the statements, the verdict would have been different. *State v. Blackwell,* 978 S.W.2d 475, 479 (Mo.App.1998).

After reviewing the record, we are not persuaded that the State's closing argument was a decisive factor for the jury in finding Appellant guilty. The State's case against Appellant was strong. Although Victim did not see his face, she identified the shirt that was seized from Appellant upon his arrest as the shirt her attacker wore the day of the rape. Victim was also able to give a detailed description of the van in which she was abducted and raped. This description matched that of the van Appellant drove: aquamarine or topaz blue color with sliding doors, a light-colored interior, and bench seats with no headrests in the second and third rows.

Ms. Elliston testified that on the morning of the rape she saw a bluish-green van on her property. She further testified she saw the man's face as he drove by. Ms. Elliston not only assisted the police in creating a computer-generated composite, but also later identified Appellant in a photographic lineup and at trial as the man she saw driving the van from her field.

Plaster casts were made of the tire tracks found near the rape scene. The director of the crime lab determined that the tire tracks had come from Goodyear Conquest tires, which were the same tires on Appellant's van.

Although a handgun was not found in Appellant's home, there was testimony from a witness that he had purchased a handgun from Appellant sometime between Halloween and the middle of November 2000. Additionally, when officers searched Appellant's home, they found two .380 caliber bullets on a shelf in a laundry room.

Further, Appellant's former girlfriend, Ms. Wyrick, testified at trial that Appellant asked her to baby-sit his children on the morning of the rape because he had to work. Appellant dropped his children off with her around 4:15 a.m. Evidence in the record reveals that Appellant did not re-

---

**12.** All rule references are to Missouri Court Rules 2002.

port to work that day nor had he worked the day before.

Additionally, Ms. Heincker testified that Appellant's DNA profile taken from the buccal swabs he provided at the police station was consistent with the DNA profile found in the vaginal swabs from Victim.

Detective Hawkins also testified at trial that during the course of the investigation an anonymous caller contacted the Carthage Police Department. Although there was no testimony that the caller said "there's a guy that looks like the composite," the fact is the caller described Appellant and his van, and reported that Appellant worked at H.E. Williams. Ultimately, it was that phone call that lead police to Appellant's place of employment, where they found the van matching the description given by both Victim and Ms. Elliston.

Given the factual circumstances of this case, we are not persuaded that the lack of trial court action in *sua sponte* correcting the State's closing argument rose to the level of manifest injustice or miscarriage of justice. Point denied.

The judgment of the trial court is affirmed.

MONTGOMERY, P.J., concurs.

GARRISON, J., concurs.